Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs David Melvin, J.L., and Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **DAVID MELVIN and J.L.**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>**23ANDME, INC.**, a Delaware corporation,<br><br>*Defendant.* | Case No. 24-cv-00487-SK<br><br>**MOTION TO APPOINT INTERIM LEADERSHIP OF CLASS ACTION**<br><br>Hearing Date: March 4, 2024<br>Time: 9:30 a.m.<br>Place: Courtroom C, 15th Floor<br>Judge: Hon. Sallie Kim |

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT, on March 4, 2024 at 9:30 am in Courtroom C, 15th Floor of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, San Francisco, California 94102, this Motion for Appointment of Interim Lead Counsel filed by Plaintiffs in the above-captioned action will be heard. Pursuant to Fed. R. Civ. P. 23(g), Plaintiffs move to appoint Rafey S. Balabanian as Interim Lead Counsel for the putative class set forth in the above-captioned action, as well as the broader set of related actions pending in the Northern District of California against 23andMe, Inc. Plaintiffs' Motion is based on this Notice of Motion and the supporting Memorandum of Points and Authorities.

## STATEMENT OF REQUESTED RELIEF

Plaintiffs request that the Court appoint Rafey S. Balabanian of Edelson PC as Interim Lead Counsel for the putative class in the above-captioned action, as well as the broader set of related actions pending in the Northern District of California against 23andMe, Inc., pursuant to Fed. R. Civ. P. 23(g).

Respectfully Submitted,

**DAVID MELVIN and J.L.**, individually and on behalf of all others similarly situated,

Dated: January 26, 2024

By: /s/ Rafey S. Balabanian
One of Plaintiffs' Attorneys

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson (*pro hac vice* forthcoming)
jedelson@edelson.com
J. Eli Wade-Scott (*pro hac vice* forthcoming)
ewadescott@edelson.com
Michael Ovca (*pro hac vice* forthcoming)

1

movca@edelson.com
Emily Penkowski Perez (*pro hac vice*
forthcoming)
epenkowski@edelson.com
Hannah P. Hilligoss (*pro hac vice* forthcoming)
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the Putative Class*

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ....................................................................................................4

      A.    The breach and vulnerable class. ..............................................................4

      B.    Procedural history and the planned mediation. ..........................................6

III.  LEGAL STANDARD .............................................................................................9

IV.   ARGUMENT .........................................................................................................9

      A.    This case involves extraordinarily sensitive data of a uniquely vulnerable
            class. ..........................................................................................................9

      B.    The mediation is not set up to secure a positive result for the class. ............12

      C.    Rafey S. Balabanian of Edelson PC should be appointed lead counsel. .......13

V.    CONCLUSION ....................................................................................................23

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3

*Bacus v. 23andMe, Inc.*,
No. 1:23-cv-16828-MSS (N.D. Ill.) ........................................................................6

4

5

*Barnes v. Aryzta*, LLC,
No. 17-cv-7358, 2019 WL 277716 (N.D. Ill. Jan. 22, 2019)..........................................16

6

7

*Benson v. DoubleDown Interactive LLC*,
No. 18-cv-00525 (W.D. Wash.) ...................................................................................15

8

*Birchmeier v. Caribbean Cruise Line, Inc.*,
No. 12-cv-04069 (N.D. Ill.) ........................................................................................14

9

10

*Cole v. Gene by Gene Ltd.*,
No. 14-cv-00004-SLG (D. Alaska)...............................................................................14

11

12

*Crumpton v. Octapharma Plasma, Inc.*,
No. 19-cv-08402 (N.D. Ill.) ........................................................................................22

13

14

*Dickey v. Advanced Micro Devices, Inc.*,
No. 15-cv-04922 (N.D. Cal.) .......................................................................................22

15

16

*Figueroa v. Kronos Inc.*,
No. 19-cv-01306 (N.D. Ill.) ........................................................................................22

17

*Fischer v. Instant Checkmate LLC*,
No. 19-cv-04892 (N.D. Ill.) ........................................................................................23

18

19

*Gill v. 23andMe, Inc.*,
No. 2:23-cv-10527-FWS-DFM (C.D. Cal.)...................................................................6

20

21

*Hu v. 23andMe, Inc.*,
No. 1:23-cv-17079-RRP (N.D. Ill.) ..............................................................................6

22

23

*In re 23andMe, Inc. Consumer Data Sec. Breach Litig.*,
MDL No. 3098 (J.P.M.L.) ........................................................................................1, 6

24

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
No. 21-md-02985-EJD (N.D. Cal.)...............................................................................18

25

26

*In re Facebook Biometric Info. Priv. Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021) ................................................................. *passim*

27

28

*In re Facebook Priv. Litig.*,
    No. 10-cv-02389 (N.D. Cal.) ........................................................................................16

*In re Facebook Simulated Casino-Style Games Litig.*,
    No. 21-cv-02777-EJD (N.D. Cal.) .................................................................................18

*In re Google Play Store Simulated Casino-Style Games Litig.*,
    No. 21-md-03001-EJD (N.D. Cal.)................................................................................18

*In re Meta Pixel Healthcare Litig.*,
    No. 22-CV-03580-WHO, 2022 WL 18399978 (N.D. Cal. Dec. 21, 2022) .....................9

*In re Tiktok, Inc. Consumer Privacy Litig.*,
    No. 20-cv-4699 (N.D. Ill.) ...........................................................................................12

*James v. PacifiCorp*,
    No. 20CV33885 (Multnomah Cnty. Ct., Or.) ...............................................................17

*Kater v. Churchill Downs Inc.*,
    886 F.3d 784 (9th Cir. 2018) ........................................................................................17

*Krause v. RocketReach, LLC*,
    No. 21-cv-1938 (N.D. Ill.) ............................................................................................23

*Kusinski v. ADP LLC*,
    No. 17-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) ...............................................23

*LaBarre v. Ceridian HCM, Inc.*,
    No. 19-CH-06489 (Cir. Ct. Cook Cnty. Nov. 30, 2022)...............................................22

*Lukis v. Whitepages, Inc.*,
    No. 19-cv-04871 (N.D. Ill. Sept. 28, 2022) .................................................................22

*McCormick v. Adtalem Glob. Educ., Inc. et al.*,
    2022 IL App (1st) 201197-U  ........................................................................................15

*Melvin v. Sequencing LLC*,
    344 F.R.D. 231 (N.D. Ill. 2023).........................................................................3, 14, 20

*Morgenstern v. 23andMe Holding Co.*,
    No. CGC-23-610816 (Sup. Ct. San Francisco)..............................................................6

*Neals v. ParTech, Inc.*,
    No. 19-cv-05660 (N.D. Ill. July 20, 2022).....................................................................23

*Pollard v. Remington Arms Co., LLC*,
    320 F.R.D. 198 (W.D. Mo. 2017) ................................................................22

*Santana v. 23andMe, Inc.*,
    No. 23-cv-05147 (N.D. Cal.) ............................................................ *passim*

*Sosa v. Onfido, Inc.*,
    No. 20-cv-04247 (N.D. Ill. Dec. 4, 2023) ...................................................23

*Spokeo v. Robins*,
    136 S. Ct. 1540 (2016) ...............................................................................14

*Vasquez v. 23andMe, Inc.*,
    No. 23-cv-424996 (Sup. Ct. Santa Clara) .....................................................6

*Villagomez v. iSolved HCM, Inc.*,
    No. 19-CH-12932 (Cir. Ct. Cook Cnty. May 11, 2023) ................................22

*Wakefield v. ViSalus, Inc.*,
    51 F.4th 1109 (9th Cir. 2022) ....................................................................14

*Wakefield v. ViSalus, Inc.*,
    No. 3:15-cv-1857-SI (D. Or. June 24, 2019) ..........................................14, 16

**Rules**

Fed. R. Civ. P. 23 ...............................................................................9, 13

**Miscellaneous Authority**

4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS
    § 12:17 (6th ed.) .......................................................................................22

Allison Grande, *Class Counsel Gets Time to Grow Participation in Privacy* Deal, LAW360
(Nov. 22, 2023),
    https://www.law360.com/articles/1769616/class-counsel-gets-time-to-grow-
    participation-in-privacy-deal...................................................................23

Andrea Vittorio, *They've Got Next: Privacy and Cybersecurity Fresh Face Eli Wade-Scott*,
    BLOOMBERG LAW (Oct. 29, 2021),
    https://news.bloomberglaw.com/business-and-practice/theyve-got-next-privacy-and-
    cybersecurity-fresh-face-eli-wade-scott.....................................................20

Christine Schiffner, *Jay Edelson in a 'Battle for the Soul of the Plaintiffs Bar'*, Law.Com (Sept.
19, 2022),
    https://www.law.com/nationallawjournal/2022/09/19/jay-edelson-in-a-battle-for-the-
    soul-of-the-plaintiffs-bar/.......................................................................19

Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least Friended Man*, N.Y. TIMES (Apr. 4, 2015),
https://www.nytimes.com/2015/04/05/technology/unpopular-in-silicon-valley.html ..................................................................................................15, 19

David Lidsky, *Meet the lawyer who stood between Big Tech and your facial recognition data*, FAST COMPANY (Aug. 9, 2022),
https://www.fastcompany.com/90764561/jay-edelson-most-creative-people-2022. ......19

Edelson Creative, *We Don't Talk About Claims Rates* (Apr. 7, 2022)
https://www.youtube.com/watch?v=L7ULPjEB85 ........................................................22

Eric Troutman, *Deserve to Win Podcast* (July 18, 2022),
https://www.natlawreview.com/article/deserve-to-win-ep-3-jay-edelson-now-available-we-talk-dobbs-javier-and-privacy ..................................................................................19

John K. Higgins, *Supreme Court to Hear 'Non-Injury' Privacy Class Action*, E-COMMERCE TIMES (May 6, 2015),
https://www.nytimes.com/2024/01/24/us/oregon-wildfires-award.html. ......................15

Johnny Diaz, *Utility Must Pay $85 Million to People Affected by Oregon Wildfires, Jury Rules*, N.Y. TIMES (Jan. 24, 2024),
https://www.nytimes.com/2024/01/24/us/oregon-wildfires-award.html. ......................17

Jonathan Stempel, *Jury says Berkshire's PacifiCorp owes punitive damages for 2020 Oregon wildfires*, REUTERS (June 14, 2013),
https://www.reuters.com/sustainability/jury-says-berkshires-pacificorp-owes-punitive-damages-2020-oregon-wildfires-2023-06-14 ..................................................................17

*S.T.O.P. Welcomes Clearview AI, ACLU Settlement, Calls For National Ban*, SURVEILLANCE TECHNOLOGY OVERSIGHT PROJECT (May 9, 2022),
https://www.stopspying.org/latest-news/2022/5/9/stop-welcomes-clearview-ai-aclu-settlement-calls-for-national-ban ..................................................................................15

*Submitted Data Breach Notification Sample*, California Dep't. of Justice,
https://oag.ca.gov/ecrime/databreach/reports/sb24-579679. ..........................................11

*The One with the Czar*, NON-COMPLIANT PODCAST (Oct. 13, 2022),
https://podcasts.apple.com/us/podcast/non-compliant-podcast-episode-50-the-one-with-the-czar/id1491233296?i=1000582530291. ..................................................................7

## I.      INTRODUCTION

Plaintiffs David Melvin and J.L. ("Plaintiffs") hereby respectfully move the Court to appoint interim leadership of the more than thirty class actions against 23andMe, Inc. pending before it. Notwithstanding the pending petition before the JPML to consolidate these matters into an MDL (before this Court),[1] appointment of interim lead counsel now is necessary to ensure that the interests of this extremely vulnerable class are protected by a Court-supervised process. Indeed, while the cases are still procedurally up in the air, at least twenty of the 30-plus plaintiffs' firms that have filed these cases are set to attend a mediation with 23andMe on January 31, 2024. (*See* Dkt. 58 at 9.)[2] It would be one thing if plaintiffs' counsel in these cases had effectively self-ordered prior to engaging in settlement discussions. Here, though, the various firms are heading toward mediation without any leadership or organization in place, and no discussion—let alone consensus—on the value of these cases or the negotiation strategy. At best, in the absence of leadership, the scheduled mediation is bound to be inefficient and highly unlikely to produce a meaningful result. At worst, it could result in a sell-out settlement that doesn't account for the unprecedented harms inflicted on this Class.

The problems caused by the lack of leadership are already making themselves evident, resulting in a mediation process that's been kneecapped at every turn against the Class's interests. On the one hand, the mediation is hamstrung in ways that make no sense: there is a physical cap of 20 attorneys attending (though every firm is invited) because that is the size of the conference room in the hotel that was chosen. There are mediation statements from plaintiffs and 23andMe due today, with a "suggested" limit of eight pages, and which aren't being mutually exchanged. And with no leadership in place, counsel are clambering over one another to demonstrate some "value-add"—resulting, as it always does, in needless and duplicative make-work. 23andMe, for its part, has used the disorder to evade a meaningful

---

[1]      The JPML is currently considering that motion. *See In re 23andMe, Inc. Consumer Data Sec. Breach Litig.*, MDL No. 3098 (J.P.M.L.). 23andMe has also moved to stay pending the JPML's decision. *Santana v. 23andMe, Inc.*, No. 23-cv-05147-EMC, dkt. 37 (N.D. Cal. Dec. 29, 2023).
[2]      Docket references are to the *Santana v. 23andMe, Inc.* action, to which the cases have been related. No. 23-cv-05147-EMC (N.D. Cal.).

1    information exchange (having vaguely promised some information by January 23, subject to a

2    confidentiality agreement), keeping plaintiffs in the dark about the real value of a case that is

3    being mediated just days later. Meanwhile, 23andMe quietly admitted what Plaintiffs in *this*

4    case had determined from their months of investigation: 23andMe should have known that it

5    was attacked far earlier and—even with the benefit of the doubt—entirely failed to figure it out.

6    In short, the inherent *ad hoc* nature of the decision making that goes on when there is no

7    leadership structure has shown that it can't presently get the basics right, much less settle a

8    difficult case with so much at stake in a few short days.

9           It's vital for the Court to step in now given how far from a mine-run data breach case

10   this is, and the unique and ongoing risks posed to the Class. The information that was

11   exfiltrated from 23andMe by hackers is incredibly sensitive, containing not only customers'

12   full names and home addresses, but information that could only have come from a genetic

13   testing company: users' genetic heritage, ancestral origin, and DNA relatives. The hackers

14   capitalized on the fact that the information revealed people's genetic heritage to expressly

15   target vulnerable groups—so far, Chinese people and Ashkenazi Jews—in their efforts to sell

16   this information to the highest bidder on the Dark Web. Indeed, one hacker offered the data of

17   Ashkenazi Jews after a widely-reported incident in the Israel-Hamas war so that the list could

18   be used to terrorize Jews. As United States Congressman Josh Gottheimer, Ranking Member of

19   the National Security Agency and Cyber Subcommittee, put it in a letter to the FBI Director

20   Christopher Wray, this leak created an urgent need "to protect the information, locations, and

21   lives of the American Jewish population" from the threat of "domestic extremism." (Compl. ¶

22   53.) And the first hacker offering this data for sale gave explicit instructions about how they

23   would deliver the data in China, pricing the list at $50 million—a price point appealing only to

24   a significant actor. (*Id.* ¶ 46.) Later, a Dark Web buyer with the name "Wuhan" inquired

25   specifically about Chinese profiles, to which they were offered a list of 350,000 people. (*Id.*

26   ¶ 38.)

27          The Complaint filed by Melvin and J.L. provides the most fulsome analysis of these

28   posts and sets forth our investigation—aided by Edelson's in-house forensic investigations

1   team—about the extraordinary harms suffered by the individuals in the Class and provides a

2   unique perspective on the ways 23andMe could have prevented the breach or detected it

3   sooner. Remarkably, 23andMe has now been forced to admit, in a letter publicized just

4   yesterday, that our investigation was right. This demonstrates exactly why a sprint to filing and

5   mediation can't be made at the expense of a complete investigation into both the facts and legal

6   theories at issue. And here, the full extent of the harms inflicted on this Class is far from known

7   absent more information. Yet a rudderless crowd of firms is moving forward in the dark on this

8   important case.

9        In the end, this Motion is asking the Court to make *someone* interim lead for this

10   Class—to introduce structure, get information efficiently, fully investigate and flesh out the

11   claims of the extraordinarily vulnerable people in this case, and litigate or settle the case as

12   most benefits the clients. As set out below, the Court should look for the counsel that this Class

13   would want: a firm with (1) an unparalleled track record in complex privacy litigation, (2) a

14   demonstrated ability to handle a class action case from the investigation phase all the way

15   through trial, and (3) a history of exceptional settlements for the classes they represent. Edelson

16   PC ("Edelson") and its Managing Partner and Director of Nationwide Litigation, Rafey S.

17   Balabanian, have exactly that resume. Mr. Balabanian and the firm's experience shows through

18   in some ways that are obviously beneficial to this class: particularly, we have decades of

19   record-setting privacy settlements and verdicts, including the first-ever adversarially-certified

20   class under a genetic information privacy statute. *Melvin v. Sequencing LLC*, 344 F.R.D. 231

21   (N.D. Ill. 2023). But it also shows through in some less obvious ways: our commitment to the

22   things in class action settlements that most lawyers sweep under the rug, like claims rates.

23   Thinking of this Class as a "client" made up of millions of people, that client would be far less

24   likely to hire a lawyer that gave them a 2-in-100 chance of being paid, and instead would go

25   with the firm that has made it their business to get 30 to 40 out of 100 paid.

26        Plaintiffs recognize that appointing interim lead counsel is more art than science, and

27   never an easy task. Sometimes, it makes sense for the Court to stand on the sidelines and let the

28   competing firms self-order. But here, there is simply too much at stake and no indication that

order has arisen organically—quite the opposite. Plaintiffs and the Class are in need of the Court's intervention to appoint interim lead counsel before this mediation proceeds.

## II.    BACKGROUND

### A.    The breach and vulnerable class.

On October 6, 2023, Defendant 23andMe—the world's leading direct-to-consumer genetic testing company—posted on its blog that it had become aware of "suspicious activity" related to its customer accounts and determined that "threat actors" were able to access certain customer accounts. (Compl. ¶ 60.) Initially, 23andMe did not report how many accounts were affected, and only months later on December 5, 2023, did it have to admit that it was nearly *half* the company's userbase—nearly 7 million users. (*Id.* ¶¶ 64–66.) The data that was stolen was highly sensitive, including users' genetic heritage, ancestral origin, full names, home addresses, profile pictures, and birth dates. (*Id.* ¶ 3.)

But 23andMe's announcement was tardy. In reality, 23andMe customer data had been offered up for sale on a Dark Web forum called Hydra some two months earlier in August 2023. (*Id.* ¶ 46.) The hacker claimed to have contacted 23andMe at that time—a relatively common extortion practice—but "instead of taking the matter seriously, [the company] asked irrelevant questions." (*Id.* ¶ 47.) Particularly chilling was that the hacker seemed to be directing their offer of sale to Chinese government or quasi-government actors, providing details about how they would deliver the information in China, and offering the entire data package for sale at $50 million. (*Id.* ¶ 49.) People that might be considered "dissidents" to the Chinese government abroad were rightly terrified, given the government's practice of keeping minute tabs on individuals even in other countries. (*Id.*)

Ashkenazi Jews were similarly targeted by hackers. A few days before 23andMe's announcement, on October 1, 2023, a hacker claimed to have close to 20 million pieces of genomic ancestry data owned by 1 million Ashkenazi Jews available for sale on another Dark Web site, Breach Forums. (*Id.* ¶ 36.) Two days later, the same hacker claimed to have an even larger database of information including the personal genetic information ("PGI") and personally identifiable information of seven million users. In order to substantiate his claims,

the hacker shared a link to the stolen data, writing, "[t]he CSV file in the link contains the profile list of half of the members of 23andMe . . . [t]hese members have technical details such as their origin estimation, phenotype and health information, photos and identification data, raw data, and their last login date to the site." (*Id.* ¶ 39.)

After the Hamas attack on October 7, 2023 and damage to a Gaza hospital complex that at the time was attributed to Israel, the hacker came forward and made their goal of retribution against Jews explicit:



(*Id.* ¶ 42.) This post is explicitly marketing to actors seeking to target Jews. (*Id.*) As United States Congressman Josh Gottheimer, Ranking Member of the National Security Agency and Cyber Subcommittee, put it in a letter to FBI Director Christopher Wray, this leak created an urgent need "to protect the information, locations, and lives of the American Jewish population":

I am concerned that the leaked data could empower Hamas, their supporters, and various international extremist groups to target the American Jewish population and their families. The threat of violent domestic extremism poses a significant danger to America's Jewish community.

(*Id.* ¶ 53.)

### B.    Procedural history and the planned mediation.

The first putative class action lawsuit was filed three days after 23andMe's announcement hit the news, on October 9, 2023. *Santana v. 23andMe, Inc.*, No. 23-cv-05147-EMC (N.D. Cal.). Over the ensuing days and weeks, 36 more actions were filed by 37 firms—to be clear, some on the same complaint—following a common pattern after a highly-publicized data breach. The vast majority of cases were filed in the Northern District of California and related to *Santana* to be presided over by Judge Chen. A handful were filed in the Northern District of Illinois,[3] one in the Central District of California,[4] and two in California state court.[5]

23andMe filed a petition before the JPML on December 21, 2023, to consolidate all federal proceedings before this Court. That motion was opposed by a subset of plaintiffs and their counsel who have filed their cases in Illinois; however, even the oppositions acknowledged that interim counsel should be appointed to represent this Class. *E.g.*, MDL No. 3098, Dkt. 48 at 4 ("Appointment of interim class counsel in the cases related before Judge Chen will even further streamline their resolution by naming one group of counsel to act on behalf of the plaintiffs in all 30 of the cases before him."). At the least, 90% of the cases have already been centralized before this Court. Even if the oppositions are successful and the JPML declines to create an MDL, it will be because the bulk of the matters can be handled directly in this Court and the small fraction of others can be coordinated (formally or informally) by the leadership appointed here.

---

[3]      *Bacus v. 23andMe, Inc.*, No. 1:23-cv-16828-MSS (N.D. Ill.); *Hu v. 23andMe, Inc.*, No. 1:23-cv-17079-RRP (N.D. Ill.).
[4]      *Gill v. 23andMe, Inc.*, No. 2:23-cv-10527-FWS-DFM (C.D. Cal.).
[5]      *Morgenstern v. 23andMe Holding Co.*, No. CGC-23-610816 (Sup. Ct. San Francisco); *Vasquez v. 23andMe, Inc.*, No. 23-cv-424996 (Sup. Ct. Santa Clara).

1      23andMe moved to stay the cases consolidated before this Court pending the ruling of

2  the JPML (Dkt. 37), which is now fully briefed. But in the meantime, there is a mediation set

3  for January 31 between 23andMe and some portion of the plaintiffs in these thirty-plus cases—

4  before the filing of the contemplated leadership motions, and before any case management

5  conference in this case. (*See* Dkt. 58 at 9.) This early mediation, unfortunately, is going down a

6  path bristling with warning signs for, at best, a wasted opportunity, and at worst, a slap-dash

7  settlement that will be unacceptable to the Court.

8      These cases are in need of Court-appointed interim lead counsel. Where a leadership

9  structure is in place prior to mediation, a few key things happen. First, the leadership appoints

10  just one or a few lawyers to lead negotiations. That allows the plaintiffs to speak effectively

11  with "one voice," while making sure that all legitimate views on the plaintiffs' side are

12  accounted for. It also allows the right people to be at the mediation, whether from one firm or

13  several, to provide their expertise to different parts of the case in an organized way. Second,

14  organized counsel are able to make sure that sufficient investigation has been performed and

15  enough information has been gathered from the defendant to appropriately value the claims in

16  the case. Third, an effective mediation begins long before the mediation actually starts, with the

17  Parties exchanging views about the merits of the case and concrete values (both amongst

18  themselves and with the mediator) so that the day of mediation amounts to productive decision-

19  making within a principled framework. This involves, typically, many conversations and a

20  mutual exchange of substantial pre-mediation briefing. The alternative, which is unfortunately

21  true for how so many firms approach mediation, is simply going to the mediation to aimlessly

22  try to figure out how much the Defendant is willing to put on the table and taking it.[6] Finally,

23  but relatedly, leadership prevents a "race to the bottom," making sure that a defendant doesn't

24  get to seek out its desired adversaries for negotiation or litigation.

25  _____

26  [6]    Or, as a defense attorney candidly put it, the mediation is driven not by a particular view on the plaintiffs' side but dictated instead by "what a court is going to approve in a settlement. . . . Typically, the lowest number that the court will approve is the number that most plaintiffs' lawyers I'm dealing with . . . will accept." *The One with the Czar*, NON-COMPLIANT

27  PODCAST (Oct. 13, 2022), https://podcasts.apple.com/us/podcast/non-compliant-

28  podcast-episode-50-the-one-with-the-czar/id1491233296?i=1000582530291.

1    Here, by contrast, there is no meaningful order heading into the mediation, and it's

2   structured in a way that simply doesn't make sense. This is the result of certain initial decisions

3   which were somewhat arbitrary and wrongheaded, but given the press of time and the difficulty

4   in even discussing these issues with such a large group, they've gradually become immutable.

5   For instance, the attendance of the mediation is limited to 20 people in person, because that's

6   the physical capacity of the hotel room that's been rented. (Declaration of J. Eli Wade-Scott

7   ("Wade-Scott Decl."), ¶ 3.) According to 23andMe, all of the firms on file have been invited to

8   the mediation (dkt. 58 at 9), but a single lawyer from each firm is allowed to attend because of

9   space constraints. (Wade-Scott Decl. ¶ 3.) That creates artificial but material limits on who can

10   actually add value to the case. As just one example, our firm would want an experienced

11   partner from the firm present to lead the negotiation (such as Mr. Balabanian), but also the

12   firm's associates with substantial subject-matter expertise—such as Emily Penkowski Perez, an

13   associate on this matter who will (and already has) leveraged her experience as an intelligence

14   analyst with the National Security Agency to detail the need for prospective relief in this

15   unique case and how it should be structured.

16    Moreover, the abundance of attorneys but lack of clearly defined roles means that

17   everyone's efforts are focused on posturing for lead. That has resulted primarily in make-work,

18   such as numerous firms issuing various, duplicative informal discovery requests to 23andMe.

19   (*Id.* ¶ 4.) What it hasn't produced is any tangible advances of the ball, as 23andMe has made

20   only a vague commitment to produce *some* information—subject to each lawyer's signature on

21   a confidentiality agreement—on January 23, a week before the mediation. (*Id.* ¶ 5.) And all of

22   the plaintiffs and attorneys in the case were "suggested" to submit a single, eight-page

23   mediation statement that is due today. (*Id.* ¶ 6.) 23andMe, for its part, will not be sharing its

24   own mediation statement, foreclosing the last chance Plaintiffs have to learn its views on

25   mediation prior to the day of. (*Id.*) And while 23andMe has kept the plaintiffs' group shadow-

26   boxing, it has acknowledged in a filing with the California Attorney General that the breach

27   occurred months before 23andMe's announcement, without (according to 23andMe) the

28   company's detection—an admission that corroborates the more thorough investigation in

1   Plaintiffs' complaint and which materially changes 23andMe's liability. This admission
2   demonstrates exactly why a rush to mediation without all the facts is so detrimental to the
3   Class. Plaintiffs are in fact in favor of mediating the case. But that process has to be informed
4   by an actual investigation, not artificially limited in ways that harm the class, and with an
5   experienced firm in the driver's seat. Edelson sets forth the reasons that Rafey Balabanian, the
6   firm's Managing Partner and Nationwide Director of Litigation, should be appointed below.
7   But regardless, the complex facts of this case and the extraordinary harms that the Class has
8   suffered demands more than the path we are on.

9   **III.     LEGAL STANDARD**

10          The Federal Rules permit the Court to appoint "interim counsel to act on behalf of a
11  putative class before determining whether to certify the action as a class action." Fed. R. Civ. P.
12  23(g)(3). While the Rules do not set forth the circumstances in which it is appropriate to
13  appoint interim leadership, courts typically do so in this exact posture: multiple actions filed
14  with overlapping putative class definitions. *E.g.*, *In re Meta Pixel Healthcare Litig.*, No. 22-cv-
15  03580-WHO, 2022 WL 18399978, at *2 (N.D. Cal. Dec. 21, 2022). Courts consider the same
16  factors in appointing interim counsel that they do in appointing class counsel: "(i) the work
17  counsel has done in identifying or investigating potential claims in the action; (ii) counsel's
18  experience in handling class actions, other complex litigation, and the types of claims asserted
19  in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that
20  counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court may also
21  consider "any other matter pertinent to counsel's ability to fairly and adequately represent the
22  interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

23  **IV.    ARGUMENT**

24          **A.     This case involves extraordinarily sensitive data of a uniquely vulnerable**
25                  **class.**

26          In an ordinary data breach case, consumers are rightly concerned about the loss of their
27  personal information: names, addresses, social security numbers—that expose them to a range
28  of now-familiar risks, such as identity theft. But this is not an ordinary data breach case, and

1    these are not normal harms. The data collected by 23andMe include data points that can

2    uniquely be derived from someone's DNA, such as their genetic heritage and ancestral origin.

3    (Compl. ¶ 3.) As set forth fully in Plaintiffs' complaint, Plaintiffs' investigation into the posts

4    on the Dark Web has demonstrated that one of the worst imaginable uses of that data has

5    already come to pass: hackers have segmented out groups of people against whom there is

6    particular animus—so far, Ashkenazi Jews and Chinese people—and marketed that data to

7    buyers on the Dark Web most likely to act on that animus.

8         On October 1, 2023, a hacker using the alias "Golem" leaked the 23andMe DNA and

9    profile data of 1 million Ashkenazi Jews,[7] including their full names, home addresses, and birth

10   dates on Breach Forums, calling it "The most valuable data you'll ever see":

11



20   (*Id.* ¶ 36.) A user with the alias "Wuhan" replied to "Golem," asking if the hacker had any

21   "Chinese accounts" and asking to "speak privately." (*Id.* ¶ 38.) Golem responded with a link to

22

23   the DNA and profile data of 100,000 23andMe customers with Chinese ancestry, including

24   their full names, home addresses, and birth dates. (*Id.*) Golem also stated that he has a total of

25   350,000 DNA and profile records and that he would release them if there was interest. (*Id.*)

26   And the very first poster offering up the entire database for sale for $50 million—going by the

27   _____

28   [7]     Ashkenazis are a subset of the Jewish diaspora who trace their ancestry back to Central
         or Eastern Europe.

name "Dazhbog"—also pointedly described how they would deliver the information in China.
(*Id.* ¶ 46.)

　　　　Taking a step back, there are two approaches plaintiff's firms typically take in response to a high-profile data breach. One is to throw together a complaint and immediately file[8]— allowing the firm to create a narrative based on the appearance of meaningful action (sending out hollow requests for information, organizing phone calls, or frankly doing a quick mediation), but that does not deliver actual benefits to the class. The other strategy is to take the time to do a full investigation of the factual underpinning of the case, the legal theories, and the harms suffered by the Class. For instance, despite the fact that some three dozen complaints have been filed—with many of them repeating without insight 23andMe's admission that the attack was performed using "credential stuffing"—the complaints don't seem to understand the significance of that fact. Plaintiffs' complaint in this action, informed by Edelson's in-house forensic investigations team, explains why that mode of attack is exactly what should have put 23andMe on notice for swift detection of the breach, prompting earlier remedial measures. (Compl. ¶¶ 69–83.) And 23andMe has now been forced to corroborate—in a letter publicized just the day before this filing—Plaintiffs' unique allegations: 23andMe has admitted that the breach occurred starting in *April* 2023, which they were able to detect.[9] What that means is that the liability argument against 23andMe is incredibly strong here. And the most glaring difference is that the complaints on file don't fully grapple with the unique harm here, which is the extensive posts on the Dark Web that are expressly marketing people's identities to be targeted for terror. (*Id.* ¶¶ 34–59). In response to that unique harm, Plaintiffs have to explore remedies that aren't at issue in an everyday data breach case—fully laid out in Plaintiffs' claim for threat assessment and monitoring. (*Id.* ¶¶ 119–30.) Finally, many of the complaints don't address the reality that there are state statutes that specifically address genetic privacy,

---

[8]　　　　Frequently, along with a number of friendly firms filing at the same time with whom one can appear to "coordinate."

[9]　　　　*Submitted Data Breach Notification Sample*, California Dep't. of Justice, https://oag.ca.gov/ecrime/databreach/reports/sb24-579679.

1   protecting individuals in the position of the Class. (*Id.* ¶¶ 151–61.) Plaintiffs' complaint

2   represents the result of a meaningful investigation and the full picture known to date.

3       Settlement talks, similarly, must be informed by that entire picture. And, when the time

4   comes to explore settlement, it means ordering a mediation in a way that will produce the best

5   result for the class. Here, that hasn't happened.

6   **B.    The mediation is not set up to secure a positive result for the class.**

7       Right now, there's a mediation set for January 31, 2024, and it appears that at least

8   twenty of the firms representing plaintiffs in these consolidated actions are set to take part.

9   Edelson was invited to the mediation on January 15. Without divulging any confidences, we

10  can safely say that there's been no productive discussion about structure, strategy, mutually

11  accepted facts, or any of the other critical pieces of information that the parties need prior to a

12  high-stakes mediation where unprecedented class-wide injury has been inflicted. (Wade-Scott

13  Decl. ¶¶ 7-8.)

14      Plaintiffs are not casting aspersions at any particular set of plaintiffs' counsel attending

15  the mediation. The point is that, without leadership, the process is defined at every turn by the

16  absence of considered decision-making. As noted above, while most firms appear to want to

17  attend to avoid missing out in the event of a settlement, the attendance is arbitrarily capped at

18  twenty lawyers—and one per firm—due to physical capacity limits. And numerous sets of

19  counsel have issued overlapping, informal discovery requests in an effort to demonstrate that

20  they've contributed in some meaningful way,[10] while 23andMe has at the same time avoided

21  making firm commitments to produce meaningful information. 23andMe does not intend to

22  share its eight-page mediation statement with the plaintiffs' group, leaving plaintiffs in the dark

23  not just about material facts in the case—like the admissions that became public just yesterday

24

25

---

26  [10]    This kind of duplicative work does not "buy" sophisticated analysis or real strategy,
    because the point is not to efficiently gather and disseminate information into a well-structured
27  team—it's just to do the work. Edelson has thrown the red flag on exactly this kind of behavior
    before. *In re Tiktok, Inc. Consumer Privacy Litig.*, No. 20-cv-4699, dkt. 212 at 13 (N.D. Ill.
28  Apr. 14, 2022).

corroborating Plaintiffs' complaint here—but what its views on the mediation even are. In the end, virtually every process point has shaken out against the interests of the Class.

There's no need, in a case as important as this one, for the sprint to mediation. To be sure, there is a time and place for settlement discussions—even early in a case. But the sprint itself is a product of the absence of leadership, where firms don't want to be left out in the cold if another jumps at an offer the defendant is willing to make right now. That leads to pitfall after pitfall, from process design to the settlement itself.

This Class will benefit from the Court's involvement at this stage by appointing an interim lead. That will allow lead counsel to take the steps discussed above, including: appointing a well-informed negotiation team that is able to capitalize on their specialized experience to best serve the interests of the Class, creating a considered and efficient process for the exchange of information with 23andMe to fully explore the claims at issue in this case, and avoiding giving 23andMe the benefit in a negotiation of its choice of a disorganized adversary. To be absolutely clear, Plaintiffs are not asking the Court to "sit in" on the eventual mediation or process leading up to it—once empowered to do so, lead counsel can create a process that allows the case to move forward expeditiously with the sole focus on the Class's interests. But the Court's involvement now will be a boon to the Class and the litigation generally.

### C.   Rafey S. Balabanian of Edelson PC should be appointed lead counsel.

In determining interim leadership, the Court's role is akin to hiring counsel to a "client" made up of millions. The clients in this case would rightly want a few key things: counsel (1) who are experienced with cases arising from new technologies, particularly privacy cases; (2) who have an established track record of prevailing at every stage of a case, from the motion to dismiss through trial; and (3) who have demonstrated their commitment to competently representing people in class actions particularly, like actually getting people paid in settlements. *See* Fed. R. Civ. P. 23(g). The undersigned, Rafey S. Balabanian of Edelson PC, fits that bill.

1    Edelson PC is a nationally-recognized leader in high-stakes plaintiffs' work, ranging

2 from class and mass actions to public client investigations and prosecutions. The firm has

3 repeatedly been recognized by Law360 as Cybersecurity & Privacy Group of the Year (2017,

4 2018, 2019, 2020, 2022, 2023), Consumer Protection Group of the Year (2016, 2017, 2019,

5 2020), and a "Privacy Litigation Heavyweight" and "Cybersecurity Trailblazer" by the

6 National Law Journal (2016). The National Law Journal also recognized us as "Elite Trial

7 Lawyers" in Consumer Protection (2020, 2021), Class Action (2021), Privacy/Data Breach

8 (2020), Mass Torts (2020), and Sports, Entertainment and Media Law (2020). Just considering

9 cases where Edelson PC has served as lead counsel, the firm's verdicts and settlements exceed

10 $5 billion. (Declaration of Rafey S. Balabanian ("Balabanian Decl."), ¶ 3.)

11    Edelson's track record in privacy cases, particularly, is unparalleled. The firm filed the

12 first-ever case under the Illinois Biometric Information Privacy Act ("BIPA"), which resulted

13 in the largest single-state privacy settlement ever at $650 million. *See In re Facebook Biometric*

14 *Information Privacy Litig.*, 522 F. Supp. 3d 617 (N.D. Cal. 2021).[11] (Balabanian Decl. ¶ 4.)

15 The firm holds the record for the largest-ever privacy jury verdict at $925 million. *Wakefield v.*

16 *ViSalus, Inc.*, No. 3:15-cv-1857-SI (D. Or. June 24, 2019).[12] (Balabanian Decl. ¶ 8.) We are

17 also pioneers in litigation under the state genetic information privacy statutes specifically at

18 issue in this case and obtained the first-ever adversarially-certified class under any such statute.

19 *Melvin*, 344 F.R.D. at 233 (Illinois Genetic Information Privacy Act); *see also Cole v. Gene by*

20 *Gene Ltd.*, No. 14-cv-00004-SLG (D. Alaska) (Alaska Genetic Information Privacy Act).

21 (Balabanian Decl. ¶ 5.) The firm also holds the record for the largest TCPA settlement.

22 *Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12-cv-04069 (N.D. Ill.); (Balabanian Decl. ¶ 3).

23 The firm was lead counsel in *Spokeo v. Robins*, in which the Supreme Court held that

24 "intangible harm" could satisfy Article III standing requirements. *See* 136 S. Ct. 1540 (2016).

25

---

26 [11]    The Robbins Geller firm was Edelson's co-counsel in that case and has also filed a case here.

27 [12]    The verdict was later vacated, with the Ninth Circuit holding that the lower court had to consider whether the damages awarded by the jury potentially violated due process. *Wakefield*

28 *v. ViSalus, Inc.*, 51 F.4th 1109, 1125 (9th Cir. 2022).

1  Commentators called the case "the most important privacy class action and consumer case of

2  the decade."[13] Litigating on behalf of the American Civil Liberties Union, we obtained a

3  consent decree in 2022 that permanently enjoins Clearview from selling access to its massive

4  database of facial vectors to any private person or company, as well as additional restrictions—

5  a settlement that has been called a "milestone for civil rights."[14] In short, Edelson is the

6  nation's leading class action firm on privacy issues, with the firm's cases "read[ing] like a time

7  capsule of the last decade, charting how computers have been steadfastly logging data about

8  our searches, our friends, our bodies."[15] (Balabanian Decl. ¶ 3.)

9      Just last year, Judge Lasnik of the Western District of Washington, in assessing the final

10  fairness of the firm's $415 million settlement with an operator of an alleged illegal online

11  casino, described how the Edelson firm worked "in the Executive branch, in the Legislative

12  branch, and the Judicial branch" to secure an extraordinary result for its clients in a "unique"

13  case—describing the firm as "all in with high quality and very admirable lawyering[.]" *Benson*

14  *v. DoubleDown Interactive LLC*, No. 18-cv-00525, Dkt. 550 (W.D. Wash. June 22, 2023).

15  (Balabanian Decl. ¶ 6.) The Illinois Appellate court recently cited a lower court's findings that

16  Edelson PC is "highly experienced and more than competent," that they had performed "an

17  extraordinary job to secure the amount of money for the class," and that the settlement Edelson

18  achieved was "truly an extraordinary resolution to the great benefit of the class." *McCormick v.*

19  *Adtalem Glob. Educ., Inc. et al.*, 2022 IL App (1st) 201197-U, ¶ 30. (Balabanian Decl. ¶ 7.) In

20  approving the settlement in *In re Facebook Biometric Privacy Litigation*, Judge Donato of the

21  Northern District of California noted the "landmark result" achieved for the Class, observing

22  that Edelson and its co-counsel had produced a "major win for consumers in the hotly

23

24  [13]  *See* John K. Higgins, *Supreme Court to Hear 'Non-Injury' Privacy Class Action*, E-
    COMMERCE TIMES (May 6, 2015), https://www.ecommercetimes.com/story/supreme-
    court-to-hear-non-injury-privacy-class-action-82015.html.

25  [14]  *See S.T.O.P. Welcomes Clearview AI, ACLU Settlement, Calls For National Ban*,
    SURVEILLANCE TECHNOLOGY OVERSIGHT PROJECT (May 9, 2022),

26  https://www.stopspying.org/latest-news/2022/5/9/stop-welcomes-clearview-ai-aclu-settlement-
    calls-for-national-ban.

27  [15]  Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least
    Friended Man*, N.Y. TIMES (Apr. 4, 2015),

28  https://www.nytimes.com/2015/04/05/technology/unpopular-in-silicon-valley.html.

contested area of digital privacy." 522 F. Supp. 3d at 621. (Balabanian Decl. ¶ 4.) In *Barnes v. Aryzta*, the court endorsed an expert opinion finding that we "should 'be counted among the elite of the profession generally and [in privacy litigation] specifically' because of [our] expertise in the area." No. 17-cv-7358, 2019 WL 277716, at *3 (N.D. Ill. Jan. 22, 2019); *see also In re Facebook Priv. Litig.*, No. 10-cv-02389, dkt. 69 (N.D. Cal. Dec. 10, 2010) (former Chief Judge Ware of the Northern District of California, calling the firm "pioneers" and noting that Edelson has been at the forefront of "some of the largest consumer class actions in the country" on those issues). (Balabanian Decl. ¶ 7.)

In a case like this one, a defendant needs to understand that it is up against top-flight counsel equipped for every stage of a case—from investigation through trial. Edelson boasts a unique-in-the-industry forensic investigations team headed by Shawn Davis. (Balabanian Decl. ¶ 11.) Mr. Davis holds numerous certifications relevant to this data breach case, including ISC2 CISSP, GIAC Forensic Examiner, and GIAC Incident Handle (among many others). (*Id.* ¶ 7.) Mr. Davis serves as an in-house technical expert for the firm, including testifying at trial in federal court, and is routinely asked to testify before legislative bodies on critical areas of emerging artificial intelligence, cybersecurity, and privacy. (*Id.*) In 2020, Mr. Davis was appointed by the Executive Office of the President to the Federal Government Advisory Committee on Data for Evidence Building with the U.S. Department of Commerce for a two-year term. (*Id.*) This resource, along with the firm's substantial subject-matter expertise, allows the firm to routinely undertake in-house, complex reviews of novel and proprietary technology, security assessments, and the investigation and analysis of highly confidential and complex source code—all technical issues that have already and will continue to present themselves in this case. (*Id.*)

Turning to the latter phases of the case: While it used to be a virtual certainty that class cases would settle prior to trial, that has become less and less true as firms like Edelson demonstrate that juries will award significant victories to class members, including in privacy cases. As discussed above, Edelson took the *Wakefield* case to a $925 million verdict. And just last year, we helped deliver a historic verdict to a certified class of victims of the Labor Day

1   wildfires in Portland, which established liability and punitive damages for thousands of class

2   members.[16] Just this week, Edelson co-led a trial resulting in a second verdict in the damages

3   phase of that litigation awarding $85 million to nine victims of the wildfires, paving the way to

4   tens of billions in damages class-wide.[17] (Balabanian Decl. ¶ 8.) The point, of course, is not

5   that every case must or should go to trial—just that the best results can be reached only where

6   there is a credible possibility that the lawyers can do that. As just one example, the $650

7   million *Facebook Biometric* settlement was reached on the eve of trial after years of litigation

8   and successful appeals in the Ninth Circuit.

9           The firm has significant experience leading aggregated litigation in challenging cases

10   presenting complex, novel issues of law. The firm (and Mr. Balabanian specifically) were

11   among those who served as counsel for the Tort Claimants' Committee in one of the largest

12   and most complex bankruptcies in the history of the country involving the giant West Coast

13   utility PG&E, which resulted in a $13.5 billion settlement for fire victims, the firm's clients

14   among them. (Balabanian Decl. ¶ 9.) As discussed above, we successfully certified a class for

15   victims of the Labor Day 2020 wildfires in Portland to litigate the issue of liability and punitive

16   damages class-wide—prevailing on each of those issues at trial after years of litigation. *See*

17   *James v. PacifiCorp*, No. 20CV33885 (Multnomah Cnty. Ct., Or.). (Balabanian Decl. ¶ 9.) And

18   we frequently represent states in multistate investigations and litigation, including the District

19   of Columbia against JUUL for deceptive trade practices, and New Hampshire, Utah, and the

20   District of Columbia against social media companies for harming a generation of their citizens

21   with social media addiction. (Balabanian Decl. ¶ 10.) And after securing a watershed Ninth

22   Circuit victory for consumers in *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018),

23   we've successfully litigated consumer claims against numerous gambling companies for

24   allegedly profiting from illegal internet casinos—where we've already secured $651 million in

25

26   [16]       Jonathan Stempel, *Jury says Berkshire's PacifiCorp owes punitive damages for 2020 Oregon wildfires*, Reuters (June 14, 2013), https://www.reuters.com/sustainability/jury-says-berkshires-pacificorp-owes-punitive-damages-2020-oregon-wildfires-2023-06-14.

27   [17]       Johnny Diaz, *Utility Must Pay $85 Million to People Affected by Oregon Wildfires, Jury Rules*, N.Y. Times (Jan. 24, 2024),

28   https://www.nytimes.com/2024/01/24/us/oregon-wildfires-award.html.

cash relief. (Balabanian Decl. ¶ 6.) The firm (and Mr. Balabanian specifically) have been appointed interim lead counsel in subsequent multidistrict litigation against the platforms that hosted those alleged illegal casinos. *See In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, No. 21-md-02985-EJD (N.D. Cal.); *In re Google Play Store Simulated Casino-Style Games Litig.*, No. 21-md-03001-EJD (N.D. Cal.); *In re Facebook Simulated Casino-Style Games Litig.*, No. 21-cv-02777-EJD (N.D. Cal.). Each of these cases involved myriad issues of first impression, in which the firm successfully worked within coalitions (and are still doing so) to deliver extraordinary results to our clients. (Balabanian Decl. ¶ 10.)

Rafey S. Balabanian, Edelson PC's Managing Partner and Director of Nationwide Litigation, has the subject-matter and complex, aggregate litigation experience to provide effective leadership here. Mr. Balabanian has been appointed lead class counsel in dozens of class actions in state and federal courts across the country and has resolved numerous cases to the benefit of the clients and classes he has represented. While much of Mr. Balabanian's prior work will inform and support his efforts here—as detailed in Edelson PC's firm resume (*see* Balabanian Decl. ¶ 16, Ex. 1)—some are worth highlighting here. First, Mr. Balabanian was one of the principal attorneys representing Plaintiffs in the *In re Facebook Biometric Information Privacy Litigation* matter, in which he was central in securing adversarial class certification and reaching a record-breaking settlement on the eve of trial—demonstrating his expertise in privacy actions and ability to secure excellent results for the class. (Balabanian Decl. ¶ 12.) Second, Mr. Balabanian has significant experience leading complex cases: Mr. Balabanian was one of the attorneys who served the Tort Claimants' Committee in the PG&E bankruptcy, and played a significant role in reaching the $13.5 billion settlement on behalf of fire victims, and was appointed interim lead counsel in the consolidated litigation seeking to hold technology platforms liable for their hosting of illegal online casinos. *See supra.* Mr. Balabanian's familiarity with pressing difficult issues of law alongside other counsel will serve this Class well. (Balabanian Decl. ¶ 12.)

Mr. Balabanian, while leading the case, naturally will not work alone. The team working on this matter at Edelson PC includes Jay Edelson, J. Eli Wade-Scott, Michael Ovca,

Emily Penkowski Perez, and Hannah Hilligoss. Each of these individuals' experience is set forth in full in the firm's resume, but a few particulars are again worth highlighting here:

- **Jay Edelson.** Jay Edelson—the firm's Founder and CEO—has been one of the central figures in the development of modern consumer privacy law. An adjunct privacy professor at UC Berkeley School of Law, he's been described by the New York Times as "Tech's Least-Friended Man,"[18] and called "probably the best known, and most innovative, consumer privacy lawyer on the planet."[19] (Balabanian Decl. ¶ 13.) Mr. Edelson has been named three times as a "Titan of the Plaintiff's Bar" by Law360 (2014, 2021, and 2023), and has been consistently recognized both inside and outside the legal profession for his privacy groundbreaking work, profiled as one of Fast Company's "Most Creative People in Business"—the first plaintiffs' attorney to ever receive the award. [20] (Balabanian Decl. ¶ 13.) Equally important, Mr. Edelson has been the leading voice of the reform wing of the plaintiffs' bar.[21] Mr. Edelson has, and will, leverage his unique skillset in this litigation to focus on development of applicable claims to these unprecedented facts, as well as litigation and negotiation strategy.

- **J. Eli Wade-Scott (*Harvard Law School '14, magna cum laude*).** Mr. Wade-Scott is the firm's director of class action litigation, and has been appointed class counsel in dozens of privacy actions. He has delivered hundreds of millions of dollars to consumers in privacy cases—always with strong settlement structures that drive unprecedented class engagement in claiming their money at the time of settlement (as further discussed below). (Balabanian Decl. ¶ 13.) Indeed, Mr. Wade-Scott is a pioneer when it comes to using direct checks in privacy cases, setting a standard followed by

---

[18]     Dougherty, *supra* n.15.
[19]     Eric Troutman, *Deserve to Win Podcast* (July 18, 2022), https://www.natlawreview.com/article/deserve-to-win-ep-3-jay-edelson-now-available-we-talk-dobbs-javier-and-privacy.
[20]     David Lidsky, *Meet the lawyer who stood between Big Tech and your facial recognition data*, FAST COMPANY (Aug. 9, 2022), https://www.fastcompany.com/90764561/jay-edelson-most-creative-people-2022.
[21]     Christine Schiffner, *Jay Edelson in a 'Battle for the Soul of the Plaintiffs Bar'*, Law.Com (Sept. 19, 2022), https://www.law.com/nationallawjournal/2022/09/19/jay-edelson-in-a-battle-for-the-soul-of-the-plaintiffs-bar/.

numerous subsequent settlements. (*Id.*) Mr. Wade-Scott also represents governments in cases pressing first-impression privacy issues, including on behalf of the District of Columbia against Facebook in its litigation arising from Cambridge Analytica and on behalf of New Mexico against Google for violations of the Children's Online Privacy Protection Act. (*Id.*) Mr. Wade-Scott has been recognized as a Rising Star of the Plaintiffs' Bar for three consecutive years by the National Law Journal, and was profiled by Bloomberg Law as one of "Five Fresh Faces to Know in Privacy and Cybersecurity."[22] Mr. Wade-Scott will assist Mr. Balabanian in leading the litigation and managing the nuts-and-bolts work of day to day class action practice, from crafting discovery strategies to settlement structure.

- *Michael Ovca (Northwestern Law School '17, cum laude).* Mr. Ovca has been one of the firm's lead associates on technology and privacy matters since he began at Edelson in 2017 and has worked on or led more than two dozen privacy and technology actions at the firm. (Balabanian Decl. ¶ 13.) Most notably, Mr. Ovca was recently the lead associate in securing the first-ever adversarially certified class under *any* state's genetic privacy law in *Melvin v. Sequencing, Inc.*, and was appointed class counsel there.

- *Emily Penkowski Perez (Northwestern Law School '20, cum laude).* Ms. Penkowski-Perez not only brings substantial experience from her work on more than ten technology/privacy actions at the firm, including her work representing the District of Columbia in its groundbreaking action against Facebook, but also the singular perspective of someone who has worked as an intelligence analyst for the National Security Agency, in the Office of Counterintelligence & Cyber (previously the NSA/CSS Threat Operations Center) and the Office of Counterterrorism. (Balabanian Decl. ¶ 13.) Ms. Penkowski is routinely pulled into matters in which the firm can

---

[22]   Andrea Vittorio, *They've Got Next: Privacy and Cybersecurity Fresh Face Eli Wade-Scott*, BLOOMBERG LAW (Oct. 29, 2021), https://news.bloomberglaw.com/business-and-practice/theyve-got-next-privacy-and-cybersecurity-fresh-face-eli-wade-scott.

1    leverage her unique expertise. (*Id.*)

2    - **Hannah Hilligoss (*Harvard Law School '22, cum laude*).** Ms. Hilligoss's

3    practice focuses on privacy and technology actions at the firm, where she has worked on

4    numerous technology and privacy actions since beginning at the firm. (*Id.*) Prior to

5    joining Edelson, Ms. Hilligoss worked at Harvard's Berkman Klein Center for Internet

6    and Society, where she authored several papers on ethics and governance in new

7    technologies, particularly artificial intelligence, and led a working group of Harvard

8    faculty focused on ethical technology development. (*Id.*) Ms. Hilligoss's proven ability

9    to parse technological and privacy issues without precedent and determine how law and

10   policy should address them will yield significant dividends for the Class.

11   To be clear, Edelson is not asking for this entire team of attorneys to be appointed lead

12   counsel—that is appropriately settled on the shoulders of one final decision-maker or organized

13   with a co-lead—but to highlight the depth and variety of experience that the firm brings to the

14   case. And the firm has resources to address every phase of the case: in addition to the dedicated

15   investigations and in-house forensic investigations team, as well as the deep bench of litigators

16   assigned to the case, the firm also has a dedicated appellate team, a dedicated trial team, and a

17   dedicated government affairs team (which is often pulled in if the case involves legislative

18   skirmishes or if the firm needs to coordinate with governmental actors). (*Id.* ¶ 14.) Nor, simply

19   put, does the firm lack the material resources to contend with a well-financed adversary. We've

20   recovered billions of dollars for the firm's clients, but equally important, have demonstrated

21   that the firm has been run soundly from a financial point of view: A good marker is to look at

22   how firms weathered the COVID-19 pandemic; while many of plaintiffs' firms (either properly

23   or not) competed against their clients to take large Paycheck Protection Program loans, our firm

24   did not—and in fact, continued with its commitment to grow and increased salaries and

25   benefits for our employees. (*Id.* ¶ 15.)

26   Finally, Edelson has long been vocal about raising the bar for class action practice—

27   particularly on issues that others shy away from. One relevant example is our firm's focus, and

28   accompanying track record, on driving exceptional claims rates in class action settlements.

Historically, plaintiffs' lawyers have been satisfied with claims rates in the single digits or lower, and courts accustomed to those numbers approved them. *E.g.*, *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 214 (W.D. Mo. 2017), *aff'd*, 896 F.3d 900 (8th Cir. 2018) (collecting cases from around the country granting final approval to settlements with less than 1% claims rate), *see also* Claiming rates, 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 12:17 (6th ed.) (noting paucity of empirical evidence on claims rates, referencing study that found three settlements with claim rates "below 5% (two of which were below 1%)"). In many cases, these low claims rates were baked in from the beginning because the settlements were claims-made and reversionary—the plaintiffs' counsel got paid based on a sticker price that included all possible money the defendant might ever pay, but the reality was that the defendant paid just the few class members that claimed. Even in an era where far more settlements are non-reversionary (claimants split the pot *pro rata*), a low claims rate is something a plaintiffs' attorney has little self-interest in calling out: it means per-claimant relief is higher, and the deal looks better at final approval.

But the reality is that a claims rate of one percent means that 1 in every 100 people in the class are actually getting monetary relief. That's not acceptable if a lawyer is putting their clients—the class—first. It has been our view that we have to talk about claims rates and insist on settlements and notice programs that drive historic engagement from the class, precisely *because* it is an issue that gets swept under the rug.[23] And our results speak for themselves:

| CASE | CLAIMS RATE |
|---|---|
| *Villagomez v. iSolved HCM, Inc.*, No. 19-CH-12932 (Cir. Ct. Cook Cnty. May 11, 2023) | 45.2% |
| *LaBarre v. Ceridian HCM, Inc.*, No. 19-CH-0648 (Cir. Ct. Cook Cnty. Nov. 30, 2022) | 34.47% |
| *Dickey v. Advanced Micro Devices, Inc.*, No. 15-cv-04922 (N.D. Cal.) | 27.3% |
| *Figueroa v. Kronos Incorporated*, No. 19-cv-01306 (N.D. Ill. Dec. 20, 2022) | 26.78% |
| *Lukis v. Whitepages, Inc.*, No. 19-cv-04871 (N.D. Ill. Sept. 28, 2022) | Two classes: 25%, 17%, respectively |

---

[23]    In addition to talking about claims rates, we occasionally sing and rap about them, too. Edelson Creative, *We Don't Talk About Claims Rates*, YOUTUBE (Apr. 7, 2022), https://www.youtube.com/watch?v=L7ULPjEB85.

| | |
|---|---|
| *Neals v. ParTech, Inc.*,<br>   No. 19-cv-05660 (N.D. Ill. July 20, 2022) | 23.86% |
| *In re Facebook Biometric Info. Priv. Litig.*,<br>   No. 15-cv-3747 (N.D. Cal. Feb. 26, 2021) | 22% |
| *Crumpton v. Octapharma Plasma, Inc.*,<br>   No. 19-cv-08402 (N.D. Ill. Feb. 16, 2022) | 22% |
| *Sosa v. Onfido, Inc.*,<br>   No. 20-cv-04247 (N.D. Ill. Dec. 4, 2023) | Two classes: 18.3%,<br>20.1%, respectively |
| *Kusinski v. ADP LLC*,<br>   No. 17-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) | 12.7% |
| *Krause v. RocketReach, LLC*,<br>   No. 21-cv-1938 (N.D. Ill. Sept. 12, 2023) | 12.11% |

Return for a moment to the concept of the class as a client who, through the Court, is deciding who to hire as counsel. It would be quite relevant to that class-as-client if one firm is likely to get 20 to 40 out of every 100 class members paid, versus another firm with a track record in the single digits. And we take this seriously even when no one is looking over our shoulders: in a recent settlement, the claims rate prior to final approval was stalling at 2.59%. Despite the likelihood that such a rate would be approved, and with no objectors in the wings, the firm decided to ask for more time—delaying our fees, naturally—to try to drive a better claims rate. *See Fischer v. Instant Checkmate LLC*, No. 19-cv-04892, dkt. 274 (N.D. Ill. Nov. 17, 2023); *see also* Allison Grande, *Class Counsel Gets Time to Grow Participation in Privacy Deal*, Law360 (Nov. 22, 2023), https://www.law360.com/articles/1769616/class-counsel-gets-time-to-grow-participation-in-privacy-deal. Edelson ultimately reported an aggregate claims rate of more than 15% across seven settlement classes, with the second-largest class reaching a 20% claims rate. *Fischer*, No. 19-cv-04892, dkt. 283-3, ¶ 16 (N.D. Ill. Jan. 24, 2024).

## V.   CONCLUSION

The Court should act soon to appoint interim lead counsel. As it stands, 23andMe enjoys a distinct advantage of a disorganized adversary in a mediation that isn't structured to produce a meaningful result. That hurts the class, even if no settlement is ultimately reached, because it undermines actual progress and gins up needless billing. There is a better path, and leadership should be appointed to steer this case down it. Plaintiffs respectfully request that the Court appoint Rafey S. Balabanian of Edelson PC as interim lead counsel.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

**DAVID MELVIN and J.L.**, individually and on behalf of all others similarly situated,

Dated: January 26, 2024

By: /s/ Rafey S. Balabanian
One of Plaintiffs' Attorneys

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson (*pro hac vice* forthcoming)
jedelson@edelson.com
J. Eli Wade-Scott (*pro hac vice* forthcoming)
ewadescott@edelson.com
Michael Ovca (*pro hac vice* forthcoming)
movca@edelson.com
Emily Penkowski Perez (*pro hac vice* forthcoming)
epenkowski@edelson.com
Hannah P. Hilligoss (*pro hac vice* forthcoming)
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the Putative Class*