# EXHIBIT 1-A

**Edelson PC**

350 North LaSalle Street, 14th Floor, Chicago, Illinois 60654
t 312.589.6370 | f 312.589.6378 | www.edelson.com

February 14, 2024

**VIA ELECTRONIC MAIL**

Ian C. Ballon
ballon@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue, 5th Floor
East Palo Alto, California 94303

Kristin O'Carroll
ocarrollk@gtlaw.com
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105

Rebekah S. Guyon
guyonR@gtlaw.com
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067

Re:   *Melvin, et al. v. 23andMe, Inc.*, Case No. 3:24-cv-00487 (N.D. Cal.)

Counsel:

We write in response to 23andMe's announcement that it intends to sell customers' genetic data to third-party organizations. *See* Thomas Germain, *23andMe Admits 'Mining' Your DNA Data Is Its Last Hope*, GIZMODO (Feb. 13, 2024), https://gizmodo.com/23andme-admits-mining-your-dna-data-is-its-last-hope-1851252582. This is a drastic, and seemingly urgent, expansion on what was previously a one-off agreement with GlaxoSmithKline. Paired with the fact that the company is telling anyone who will listen that it is on the verge of bankruptcy, we are—we hope unsurprisingly—incredibly concerned about the fate of the genetic information that is in the company's hands, as well as where the company's focus is at this time. When the company is publicly aimed at squeezing every last drop of profit out of its customers' genetic information, we have fair questions about what steps the company has taken and will take to protect the extraordinarily sensitive data that customers have provided to it.

In short, we'd like to further understand what it is the company is planning to do and, in light of the company's insinuations about its own limited resources, whether it has actually expended the necessary resources to protect customer data rather than sell it.

To be clear, if the plan is as described by CEO Wojcicki, we view it as facially violative of the law for every class member, and particularly those vulnerable class members who have already been targeted—including specifically for "research"—on the Dark Web. 23andMe represents to its customers that their genetic information will not be sold without their express consent, yet it now seeks to sell access to their data on a scale seemingly limited only by the number of willing buyers. *See Will The Information I Provide Be Shared With Third Parties?*,

**Edelson PC**  *Melvin v. 23andMe*
February 14, 2024
Page 2 of 5

23ANDME.COM ("23andMe does not sell, lease, or rent your Genetic Information or sensitive Personal Information without receiving your explicit consent.").

Moreover, selling access to customers' genetic information without specific and separate consent for each disclosure constitutes unlawful conduct under the California Unfair Competition Law, Cal. Bus. & Prof Code § 17200 et seq. ("UCL"). The California Genetic Privacy Act requires "separate and express consent" for "[e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider, including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed." Cal. Civ. Code § 56.181(a)(2)(D). 23andMe's *Research Consent Document*, 23ANDME.COM, https://www.23andme.com/about/consent/ ("Research Consent Document"), indicates that it shares customers' genetic information with "non-profit organizations, pharmaceutical companies, [and] academic institutions," and specifically notes that it "will not ask [customers] for separate permission every time [it] share[s]" customers' genetic information. This vague, blanket consent practice does not comply with the California law and, consequently, violates the UCL.

This practice also violates the Illinois Genetic Information Privacy Act ("GIPA") and other state genetic privacy statutes. As relevant here, GIPA only permits disclosure to a "person designated in a *specific* written legally effective authorization." 410 ILCS 513/30 (emphasis added); *see also* Or. Rev. Stat. Ann. § 192.539 (permitting disclosure only when it "is specifically authorized by the tested individual . . . by signing a consent form prescribed by rules of the Oregon Health Authority"). 23andMe's generic Research Consent Document and its Individual Data Sharing Consent form—neither of which name the entities with which 23andMe shares customers' genetic information—do not come close to meeting these standards.

Accordingly, we have the following questions,[1] where "you" refers to the company:

1. Describe the changes you have made to monitor, detect, and prevent the unauthorized access to 23andMe customer data since the recent breach(es). Specifically:

    A. Identify measures you have put in place to monitor unusual patterns for log-ons as well as access to genetic or other sensitive data.
    B. Identify any new information security protection software or hardware you have implemented since the breach, including but not limited to, encryption, antivirus/antimalware/endpoint detection and response software, network or web application firewalls, intrusion detection or prevention systems, data loss prevention, access control, or others.
    C. Identify and describe any other threat detection or mitigation tools that you have put in place, including but not limited to:
        1. Has 23andMe implemented CAPTCHA for all log-in attempts?

---

[1] The answers to questions relating to internal information security practices should be delivered and stored in a secure manner agreed to by both parties.

**Edelson PC**  *Melvin v. 23andMe*
February 14, 2024
Page 3 of 5

2. Has 23andMe blocked known malicious or abusive IP addresses or devices?
3. Has 23andMe put measures in place to thwart workarounds to IP block-lists and rate limiting?
4. Has 23andMe implemented audit and traceability tools to monitor suspicious activity across its platform and networks—particularly related to access to sensitive genetic or other data?
5. Has 23andMe implemented detection and alerts related to suspicious access to large volumes of sensitive genetic or other data?
6. Has 23andMe implemented digital threat monitoring systems to determine if stolen information has been posted to the surface, deep, or dark webs?

D. Has 23andMe updated its information security ISO standards to track the 2022 updates?
E. Has 23andMe updated its information security policies and procedures after the breach? Please provide the pre-breach and post-breach information security policies.
F. Describe and provide reasoning for any past vulnerability or penetration testing findings (from 23andme's internal staff or third-parties) that 23andme decided not to correct or corrected with compensating controls.

2. Describe any changes you have made to the DNA Relatives feature, including any additional safeguards, protections, or warnings in place to alert customers to the risks of using this feature.

3. For third-party organizations with whom you have or are contemplating data-sharing:

   A. List all pharmaceutical or therapeutics companies with whom you have existing data-sharing agreements and detail any monetary or non-monetary benefits you have received as a result of those agreements.
   B. List all pharmaceutical or therapeutics companies with whom you have discussed entering into data-sharing agreements.

4. Describe the methods by which you purport to obtain customer consent to share data with third-party research organizations, including but not limited to:

   A. To which customers is the Research Consent Document sent? What records does 23andMe keep of customers who have agreed to this document? How many customers have provided this consent? (23andMe has represented that over 80% of customers consented to the document; please confirm if that is true.)

   B. To which customers is the "Individual Data Sharing Consent" document sent, and when? What records does 23andMe keep of customers who have agreed to this document? How many customers have provided this consent?

   C. Please confirm that customers are able to opt out of these programs via their account settings.

**Edelson PC**                                                                                                                                                                          *Melvin v. 23andMe*
February 14, 2024
Page 4 of 5

    D. Have you made, or do you anticipate making, changes to your consent practices when disclosing customers' genetic information to pharmaceutical partners?

5. For the data that is shared with third party organizations:

    A. When customers do *not* consent to individual data sharing, describe the aggregation and anonymization methods you use prior to sharing data with third-party research organizations.

    B. Describe how you de-identify customer data, if it all, when a customer has consented to individual data sharing.

    C. Describe any differences in data sharing policies when sharing data with pharmaceutical companies versus with non-profit research organizations.

6. Regarding data use by the third parties:

    A. Describe the process you use, if any, to vet third parties that have or will receive your data to ensure they are legitimate pharmaceutical or research organizations.

    B. Provide the data-sharing agreements you have with third-party organizations with whom you share or intend to share customer data. To the extent not reflected therein, please describe:

        1. Any understanding or agreement you have concerning the use and control of data, including specifically who has access and the purposes for which the data can be used by the third parties.

        2. Any measures you have taken to ensure that third-party research organizations do not attempt to re-identify data you have provided to them.

        3. The data security measures and policies regarding data storage, access, destruction, and sharing which must be in place at third-party research organizations before you release data to them, including specifically the security measures you require third parties to have to detect and prevent unauthorized access or acquisition.

    C. Describe what protocols you use to ensure data is securely transferred by you to third parties.

    D. Describe the process you use to audit and ensure data you have provided to third parties is being used for the original purpose stated.

    We do not expect that these questions come as a surprise, and we accordingly hope that 23andMe is able to answer them quickly. That said, there are a few options: the easiest is (and consistent with 23andMe's position that all the litigation should be stayed), 23andMe can agree

**Edelson PC**  *Melvin v. 23andMe*
February 14, 2024
Page 5 of 5

that it will not take any action that would be potentially violative of the law or further impair the rights of the class—including selling this data—until the cases are consolidated, leadership has been appointed, and these issues can be presented to the Court. If you can confirm that will not happen, then this issue can be taken off the table and we can address it in the normal course in the litigation. If you can't make that commitment, we'd ask that these questions be answered immediately.

      Please let us know by tomorrow what your position is: either (1) this issue is taken off the table with 23andMe's agreement not to move forward, (2) you will agree that you will give us the answers immediately, or (3) finally, you're unwilling to agree to either of those. We are also, of course, open to hearing a fourth option.

Sincerely,

Eli Wade-Scott
EDELSON PC

CC VIA ELECTRONIC MAIL:  Rafey S. Balabanian, rbalabanian@edelson.com
Jay Edelson, jedelson@edelson.com
Michael W. Ovca, movca@edelson.com
Emily Penkowski Perez, epenkowski@edelson.com
Hannah Hilligoss, hhilligoss@edelson.com