Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs David Melvin, J.L., and Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE 23ANDME, INC., CUSTOMER DATA SECURITY BREACH LITIG.**<br><br>This Document Relates to:<br>*Melvin et al. v. 23andMe, Inc.*, Case No. 24-cv-00487-EMC | Case No. 24-md-03098-EMC<br><br>**MOTION TO APPOINT INTERIM LEADERSHIP OF CLASS ACTION**<br><br>**Hearing Date:** June 13, 2024<br>**Time:** 1:30 p.m.<br>**Judge:** Hon. Edward M. Chen<br>**Place:** Courtroom 5, 17th Floor (via Zoom Webinar)<br><br>***Or other date as set by Court*** |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE THAT** on June 13, 2024 at 1:30 p.m. in Courtroom 5, 17th Floor of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, San Francisco, California 94102, via Zoom Webinar, this Motion for Appointment of Interim Lead Counsel filed by Plaintiffs in the above-captioned action will be heard before the Honorable Edward M. Chen. Pursuant to Fed. R. Civ. P. 23(g), Plaintiffs move to appoint Rafey S. Balabanian as Interim Lead Counsel for the putative class set forth in the above-captioned action, as well as other actions pending against 23andMe, Inc.

The Zoom Webinar information to access the hearing is: Webinar ID: 161 991 1861, Password: 912881. You can also access a link to the Zoom Webinar information through Judge Chen's webpage, linked here: https://www.cand.uscourts.gov/judges/chen-edward-m-emc/.

Plaintiffs' motion is based upon this Notice, the Memorandum of Points and Authorities filed herewith, and the record in this matter, along with any oral argument that may be presented to the Court and evidence submitted in connection therewith.

## STATEMENT OF REQUESTED RELIEF

Plaintiffs request that the Court appoint Rafey S. Balabanian of Edelson PC as Interim Lead Counsel for the putative class in the above-captioned action pursuant to Fed. R. Civ. P. 23(g).

Respectfully Submitted,

**DAVID MELVIN and J.L.**, individually and on behalf of all others similarly situated,

Dated: April 18, 2024

By: /s/ Rafey S. Balabanian
One of Plaintiffs' Attorneys

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson (admitted *pro hac vice*)
jedelson@edelson.com
Ari Scharg (admitted *pro hac vice*)
ascharg@edelson.com
J. Eli Wade-Scott (admitted *pro hac vice*)
ewadescott@edelson.com
Michael Ovca (admitted *pro hac vice*)
movca@edelson.com
Emily Penkowski Perez (admitted *pro hac vice*)
epenkowski@edelson.com
Hannah P. Hilligoss (admitted *pro hac vice*)
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the Putative Class*

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. BACKGROUND ....................................................................................................................4

    A. Early leadership efforts and Edelson's work for the Class. ............................4

    B. The survey. ......................................................................................................5

III. ARGUMENT ..........................................................................................................................6

    A. The Class values a litigation strategy that is based on a well-developed complaint, responds to the unique harms posed in this case, plays out in court, and is led by one or two firms. ...............................................................6

        i. Edelson's investigation and plan for litigation matches what the Class wants. ..............................................................................................7

        ii. Mr. Balabanian and his team are well-equipped to lead this case if he is appointed sole lead. ........................................................................7

    B. The Class prizes experience in privacy cases and specifically genetic privacy cases, firms with long-term financial viability, and a track record of achieving cash payments in settlements. .......................................................10

    C. Edelson's proposed case plan will efficiently move this litigation forward. ........................................................................................................12

IV. CONCLUSION .....................................................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Birchmeier v. Caribbean Cruise Line, Inc.*,
     No. 12-cv-04069 (N.D. Ill.)..................................................................................................10

*Cole v. Gene by Gene Ltd.*,
     No. 14-cv-00004-SLG (D. Alaska) ..........................................................................................9

*Frank v. Gaos*,
     139 S. Ct. 1041 (2019).............................................................................................................1

*In re Tiktok Consumer Priv. Litig.*,
     No. 20-cv-04699 (N.D. Ill. Jan. 25, 2024)...............................................................................1

*Melvin v. 23andMe, Inc.*,
     24-cv-00487-EMC (N.D. Cal.) ..................................................................................... passim

*Melvin v. Sequencing, Inc.*,
     344 F.R.D. 231 (N.D. Ill. 2023).........................................................................................9, 10

*Spokeo, Inc. v. Robins*,
     136 S. Ct. 1540 (2016) ...........................................................................................................10

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................................1

**Miscellaneous Authority**

Alissa del Riego & Joseph Avery, *The Class Action Megaphone: Empowering Class
     Members with an Empirical Voice*, 76 Stan. L. Rev. Online 1 (2023) ............................2

Alissa del Riego & Joseph Avery, *Inadequate Adequacy?: Empirical Studies on Class
     Member Preferences of Class Counsel*, 2024 Utah L. Rev. 499 (2024).......................2, 5

Edelson Creative, *We Don't Talk About Claims Rates*, YOUTUBE (Apr. 7, 2022),
     https://www.youtube.com/watch?v=L7ULPjEB85 ........................................................12

Non-Compliant Podcast, *The One with the Czar*, EDELSON CREATIVE (Oct. 13, 2022),
     https://podcasts.apple.com/us/podcast/non-compliant-podcast-episode-50-the-one-with-
     the-czar/id1491233296?i=1000582530291. ..................................................................1

*Submitted Breach Notification Sample*, Cal. Dep't. of Just.,
     https://oag.ca.gov/ecrime/databreach/reports/sb24-579679 (last visited Apr. 17, 2024) ..4

## I. INTRODUCTION

The old way of litigating privacy class actions hasn't been working. Far too often, it's resulted in anemic settlements that primarily benefit the lawyers—settlements focused on credit monitoring, *cy pres*, or that were just hastily reached. *See, e.g.*, *Frank v. Gaos*, 139 S. Ct. 1041, 1047–48 (2019) (Thomas, J., dissenting); *In re Tiktok Consumer Priv. Litig.*, No. 20-cv-04699, dkt. 316 (N.D. Ill. Jan. 25, 2024) ("It is not unusual for a case of such significance to be vigorously litigated for years; yet here the Original Plaintiffs reached a settlement in principle only nine days after the JPML issued its consolidation order."). It's an open secret in the defense bar that most settlements are driven by the lowest deal the *Court* will accept, with plaintiffs' lawyers abdicating real opposition.[1] That gives the Court a Hobson's choice when given a settlement: reject it and restart litigation, or try to make improvements on the edges.

There's a better way, but it starts with doing the work the Court is doing now: appointing class counsel that will steer the case away from that path. But that process is tough. To start, the rules of decision are fuzzy: the reality is that the express Rule 23(g) factors are met by most experienced firms. *See* Fed. R. Civ. P. 23(g) (*e.g.*, experience, knowledge of the law). The bulk of the actual decision-making, then, gets made under the nebulous mandate of "any other matter" pertinent to counsel's abilities. *See* Fed. R. Civ. P. 23(g)(1)(B).

That's challenging enough, but it gets harder still. The Court is told that it must act as a "fiduciary" for the class, but the class is a *party* appearing before it—putting the Court in the uncomfortable position of, for a moment, doing things like weighing in on the best strategy to pursue in a case that the Court presides over. Because of the dissonance of that dual role, the Court's usual function—resolving a sharply disputed question between opposing parties—suddenly seems like choosing sides. When it comes to picking class counsel, courts understandably prefer agreed slates of leadership over a subjective, ambiguous inquiry.

---

[1] As a leading defense attorney, Eric Troutman of Troutman Amin put it: "Typically, . . . the lowest number that the court will approve is the number that I think most plaintiffs' lawyers that I'm dealing with . . . will accept." Non-Compliant Podcast, *The One with the Czar*, EDELSON CREATIVE, at 29:06-19 (Oct. 13, 2022), https://podcasts.apple.com/us/podcast/non-compliant-podcast-episode-50-the-one-with-the-czar/id1491233296?i=1000582530291.

1    But one analogy for approaching this problem, as we've argued before, is that the Court is acting as an "in-house counsel" picking an outside firm for a client of millions. And that analogy makes clear why a competition—like the one the Court is holding—is a good thing: for instance, no in-house counsel would hire an "agreed" slate of firms who showed up at one's door (surely, with promises that there'd be no duplicative billing), or counsel without a meaningful strategy. Instead, in-house counsel would ask what the firms' track records were in similar cases, what the costs would be, what specific theories they would advance, their views about the actual value of the case, and how they would realize that value.

How, then, can a Court take an objective approach to deciding what's in the best interests of its temporary, millions-strong client? A burgeoning area of scholarship suggests a surprising but commonsense solution: perhaps we should just ask them. *See* Alissa del Riego & Joseph Avery, *The Class Action Megaphone: Empowering Class Members with an Empirical Voice*, 76 Stan. L. Rev. Online 1 (2023); Alissa del Riego & Joseph Avery, *Inadequate Adequacy?: Empirical Studies on Class Member Preferences of Class Counsel*, 2024 Utah L. Rev. 499 (2024). And that's just what we did.

Counsel for the *Melvin* Plaintiffs (referred to as "Edelson" here) engaged Professors Alissa del Riego and Joseph Avery—authors of the pioneering work in this area—to survey class members on the questions relevant for lead: specifically, what strategies they'd like their counsel to adopt and what characteristics the lead firm should have. The Professors were able to reach nearly 400 independent, putative Class Members. And the results were clear:

- *Strategy.* At the start of a case, Class Members prefer a thorough investigation to getting on file quickly. (*See* Ex. 1 ("Report") ¶ 6.) They want the firm to respond, both in investigation and litigation, to the unprecedented harms posed by disclosure of the class's genetic ancestry. (*Id.*) And they prefer a rigorous, in-court process to an early settlement—an issue that the *Melvin* Plaintiffs have been highlighting from day one. (*See id.*) When it comes to size of leadership, the Class overwhelmingly voted for a smaller slate (one or two firms). (*Id.*)

- *Characteristics of the firm.* The most important factor to the Class was significant experience in privacy class actions, closely followed by experience with state

genetic privacy laws. (*Id.* ¶ 8.) The Class was also concerned about the long-term financial viability of the lead firm—this was the most highly-rated factor in its section. (*See id.* ¶ 9.) And, in a settlement, the Class wants a track record not only of securing significant monetary relief, but also of getting that money to class members (high claims rates). (*Id.* ¶ 8.)

In many ways, the fact that the Class values these things is not a surprise. But beyond providing objective support for weighing these factors in the lead determination, the survey also reveals that the Class put surprising weight on things that firms rarely want to discuss: in addition to financial viability, a firm's ability to attract top talent and commitment to actually communicating with the class were highly rated. (Ex. 2 ("Data Sheet") at 20.) And—in perhaps the least-discussed item in all of plaintiffs' law—the Class cares if there's meaningful competition on price. (*See* Report ¶ 91; Data Sheet at 18 (44% rating commitment to cap fee request at 20% as "highly important").)

As we'll argue below, Rafey S. Balabanian and his team from Edelson PC fit what the Class wants. On strategy, the firm performed the most thorough investigation to date of the Class's claims prior to filing—analyzing the unique harms to the Class and identifying responsive remedies—and have been vocal about their views of the effort to reach a quick settlement that's been uninformed by vigorous opposition. It's our willingness to do the actual work of representing a class that is the bedrock of the firm's results, all of which track the Class's preferences: we are national leaders in privacy litigation, including under the genetic privacy statutes at issue here, and post record-breaking results at trial and settlement in privacy cases.

Beyond our work in individual cases, we are a leading voice of reform within the plaintiffs' bar, on everything from calling out criminality to pointing out the subtle ways in which lawyers routinely put themselves first. We will always cooperate—with our fellow plaintiffs' counsel and even defendants—but will never capitulate to a result that hurts our clients. Instead, we will do what class action clients demonstrably *want* us to do: be creative, vigorous, and worthy adversaries to the institutional players we litigate against. The Court should appoint Rafey S. Balabanian lead of the consolidated litigation.

## II. BACKGROUND

After 23andMe announced a data breach in October 2023, a deluge of class action complaints followed—to date, a total of 39 in federal court, now consolidated before this Court.[2] Relying on its own in-house forensics team, Edelson researched and developed the allegations in the *Melvin* Plaintiffs' complaint that uniquely explains the unprecedented harms facing the Class and the particularly vulnerable subset of individuals—Jewish and Chinese people, so far—whose data was marketed on the Dark Web with the all-but-explicit invitation that these individuals be targeted for (as Representative Gottheimer put it) "domestic extremism." (*Melvin v. 23andMe, Inc.*, 24-cv-00487-EMC, dkt. 1, ¶¶ 36, 39, 42, 47, 49, 53 (N.D. Cal.) (herein, "*Melvin*.")) The *Melvin* Plaintiffs' complaint (also uniquely) seeks forward-looking relief that responds to that harm in the form of threat assessment and monitoring. (*Id.* ¶¶ 119–30.) Finally, while many complaints re-reported the method of attack as "credential stuffing," the *Melvin* Plaintiffs were the only plaintiffs to explain exactly why that mode of attack makes the liability case especially strong here: 23andMe should have been able to detect the breach and respond to it months before the company announced the breach occurred. (*Id.* ¶¶ 69–83.) Since the complaint's filing, 23andMe has been forced to admit that was right: the breach began in April 2023, which 23andMe was able to detect on review.[3]

### A. Early leadership efforts and Edelson's work for the Class.

After filing, Edelson asked the Court urgently to establish leadership—making the case that it be Edelson—to prevent a race-to-the-bottom settlement. (*Melvin*, dkt. 4.) We won't again list the litany of concerns we raised in that motion, but it's notable that 23andMe has repeatedly reiterated that they've corralled all of the Plaintiffs' firms into early settlement discussions and mediation with the sole exception of Edelson. (*See, e.g.*, *Melvin*, dkt. 38, Feb. 22, 2024 Tr. at 14:20–23.) The Court denied the motion without prejudice.

Edelson also raised the alarm about 23andMe's newly-announced strategy to broadly

---

[2] The Court is well-familiar with the background facts of the breach at this point, so Plaintiffs will focus on the facts relevant to the leadership question here.
[3] *Submitted Breach Notification Sample*, Cal. Dep't. of Just., https://oag.ca.gov/ecrime/databreach/reports/sb24-579679 (last visited Apr. 17, 2024).

1   sell users' data to third parties to help stem its apparent current cash crunch. (*Melvin*, dkt. 27-
2   1.) 23andMe had not said who the third parties were, what measures would be in place to
3   protect users, nor provided assurances as to how this plan didn't break the law—and still
4   hasn't. (*Id.*) The Court at the time viewed that issue as beyond the ambit of the currently-
5   pleaded complaint, which Edelson intends to amend to include. (*Melvin*, dkt. 38, Tr. at 32:4–
6   12.) But Edelson still wanted to arm Class Members with the information they needed to
7   protect themselves, so we set up an explanatory webpage and launched an advertising
8   campaign to alert 23andMe customers that they may be enrolled in 23andMe's data-sharing
9   without knowing it and provided instructions on how they could opt-out.[4] (Declaration of
10  Rafey S. Balabanian ("Balabanian Decl.") ¶ 21.) We got this information into the hands of
11  more than three million people, and our short explainer video was organically shared more than
12  3,000 times on Facebook. (*Id.*) Ever optimistic, we attempted to work with 23andMe's counsel
13  to make the process of opting out less onerous, but that effort was rebuffed. (*Id.*)

14         **B.**    **The survey.**

15         For the Court's leadership determination, Edelson looked for ways to better understand
16  what the Class would look for in its counsel. This approach is supported by a growing area of
17  scholarship in which Professors Alissa del Riego and Joseph Avery of the University of Miami
18  are leaders: that putative class members' preferences can and should be objectively ascertained.
19  *See* del Riego & Avery, *Inadequate Adequacy?: Empirical Studies on Class Member*
20  *Preferences of Class Counsel*. Professors del Riego and Avery agreed to develop a survey that
21  solicited input from this putative class on leadership in this case. (*See generally* Report.)

22         The survey included questions relevant to the 23(g) factors and grounded in the context
23  of this specific case: asking questions about what strategies the Class preferred, what
24  characteristics they wanted in a law firm, and what results were important to them. (*Id.* ¶¶ 6–9.)
25  NERA Economic Consulting, a nationally-recognized firm, fielded the survey and garnered
26  395 responses from individuals in the Class. (*Id.* ¶¶ 43 & n.1, 47.) The Report and all of the

27  _____
    [4]    *23*andMe Data Opt-Out, Edelson, https://edelson.com/23andMe-data-opt-out (last
28  visited Apr. 17, 2023).

survey data (*see* Data Sheet) are provided here, which show a few key things. First, on strategy, Class Members overwhelmingly prefer (i) a thoroughly-researched complaint to a quick filing, (ii) a vigorous in-court litigation strategy to a quick settlement, and (iii) one or two firms to be appointed lead. (Report ¶ 6.) Second, on firm characteristics, (i) Class Members want a firm with deep experience in privacy litigation and the state genetic privacy statutes at issue here, (ii) the financial resources to litigate a difficult case, and (iii) a track record of delivering significant, monetary results to as many people as possible. (*See id.* ¶¶ 7-9.)

In some ways, these are commonsense conclusions that align with the broad Rule 23(g) factors. The Court can take comfort, however, in knowing that these considerations are actually—not just theoretically—important to the Class. Below, Edelson makes the case that we are the firm most responsive to those expressed preferences. Other firms are welcome to do so as well. But regardless of the outcome, we're excited to present this innovative approach to lead determination to the Court, and hope the Court considers these objective indicators.

### III. ARGUMENT

**A. The Class values a litigation strategy that is based on a well-developed complaint, responds to the unique harms posed in this case, plays out in court, and is led by one or two firms.**

The first bucket of survey questions was tailored to identify the Class's preference on substantive litigation strategy. Starting at the outset, the Class prefers that their attorneys take time to develop a well-researched complaint prior to filing instead of quickly getting on file. (Report ¶ 82 (67% of participants favoring the former vs. 18% preferring the latter).) And specifically, the single most important concern to the Class was that the firm seeks relief that addresses the unique harms in this case—responding to the threat of bad actors targeting the Class based on this data. (Data Sheet at 10 (67% rating "very important").) After taking time to identify the fact issues and develop the legal theories underpinning the case, the putative Class prefers that class counsel seek formal discovery and litigate rather than jumping at an early opportunity for a settlement based on informal information exchanges. (Report ¶ 82 (47% preferred claims advanced in court, despite the risks of this strategy, as opposed to 34% that favored an early mediation).) Finally, the Class markedly prefers that their case is carried out

by attorneys from one or two firms, as opposed to a team comprised of many firms. (*Id.* (indicating 50% favor appointment of one or two firms, 25% favor appointing three or more).) Every one of these Class preferences aligns with Edelson's approach, as discussed below.

               **i.**        **Edelson's investigation and plan for litigation matches what the Class wants.**

Here, Edelson's team assembled a comprehensive complaint that recognizes the extraordinary harms at issue given the sensitivity of users' genetic information and the unprecedented ways in which it was deployed by the hackers. The *Melvin* complaint includes extensive analysis of posts on the Dark Web that are expressly marketing people's identities to be targeted for terror—an issue most complaints did not grapple with at all. (Compl. ¶¶ 34–59.) This case calls for remedies that aren't normally at issue in an everyday data breach case: a claim for threat assessment and monitoring (unique in the *Melvin* complaint) and claims under state-specific genetic privacy statutes. (*Id.* ¶¶ 119–30, 151–61.) Seeking relief that addresses the risk that the Class's data could be—and has been—used to target them is simply the most important thing to the Class. (*See* Data Sheet at 10.) Respondents also found it critical that the firm seek protections for the vulnerable groups who have already been exposed on the Dark Web. (*Id.* at 11 (46% finding this "very important").) Edelson's better-developed complaint does exactly that, and demonstrates why taking the time to investigate benefits the Class.

The Class also wants the lead firm to continue dedicating resources after filing. That is, the Class prefers formal discovery and public litigation that tests the merits of the claims instead of a hastily-negotiated settlement—which aligns with the concerns Edelson has been raising from the start. (*See* Report ¶ 74.) To be clear, the survey itself does not include Edelson's specific criticisms of the mediation process that's played out so far. (*See* Data Sheet at 4.) But all indications remain that 23andMe's strategy is to drive an early and under-informed resolution of the case with some subset of Plaintiffs' counsel—a textbook example of how one would engineer a race to the bottom prior to leadership being decided. That said, the Class—*without* knowledge of that fact—prefers that the lead firm pursue formal discovery to get full information and test the Class's claims in Court prior to settling, even though they were

expressly told the downsides of that strategy: the additional uncertainty to the case's outcome and class compensation. (*Id.*) In the end, the Class prefers Edelson's approach.[5]

### ii. Mr. Balabanian and his team are well-equipped to lead this case if he is appointed sole lead.

The Class prefers "one or two" firms to be appointed lead, valuing efficiency over the benefits of a larger slate (Report ¶ 74), and the Court has rightly highlighted efficiency as a chief concern in its order on this briefing. If a firm is appointed sole or co-lead, it needs to be able to litigate every phase of this case—from investigation through trial. Mr. Balabanian and the team at Edelson have a distinct and provable track record at doing that.

As discussed above, the firm's investigation better served the Class than other complaints. Edelson's ability to do that is by design: not only does the firm have a dedicated team of investigations attorneys, but it also has a team of in-house forensic investigators, headed by Shawn Davis. (Balabanian Decl. ¶ 16.) Mr. Davis holds numerous certifications relevant to this data breach case, including ISC2 CISSP, GIAC Forensic Examiner, and GIAC Incident Handle (among many others), and serves as an in-house technical expert for the firm— including by testifying in court and before legislative bodies. (*Id.*) The benefits that this team brings are clear: as an additional example, the *Melvin* Plaintiffs' complaint demonstrates why 23andMe's inability to detect "credential stuffing" strengthens liability. (Compl. ¶¶ 69–83.)

When it comes to trial, the Edelson firm is a leader in actually taking class cases to trial, including privacy cases specifically. The firm holds the record for the largest-ever jury verdict in a privacy case at $925 million. *Wakefield v. ViSalus, Inc.*, No. 3:15-cv-1857-SI (D. Or. June 24, 2019).[6] And just last year, the firm delivered a historic verdict, establishing liability and punitive damages on behalf of a class of thousands of Oregon wildfire victims (along with our

---

[5] The Class also appreciates a firm that communicates with them. (Report ¶ 90.) Edelson does that, ranging from case-specific efforts—like this survey and our efforts to get relevant information to the Class about 23andMe's data mining program—to the routine, like the fact that our public phone lines actually go straight to us. While this shouldn't be as strange as it is, nearly a dozen class members have reached our firm's founder by simply calling his direct line—which he picks up.

[6] The verdict was later vacated, with the Ninth Circuit holding that the lower court had to consider whether the damages awarded by the jury potentially violated due process. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1125 (9th Cir. 2022).

co-counsel Keller Rohrback, who have also filed a case here). *See James v. PacifiCorp*, No. 20CV33885 (Multnomah Cnty. Ct., Or.). Since then, the damages trials co-led by Edelson have resulted in $220 million in verdicts to 36 clients, paving the way to tens of billions in class-wide damages. (Balabanian Decl. ¶ 10.)

The firm's results are the evidence of our success at every phase of litigation, particularly in cases pressing novel issues of law. The firm (along with Robbins Geller, who have also filed here) obtained the largest single-state privacy settlement ever at $650 million on the eve of trial after years of litigation and successful appeals in the Ninth Circuit in the first-ever case filed under the BIPA. *See In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617 (N.D. Cal. 2021). After securing a watershed Ninth Circuit victory for consumers in *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018), we've successfully litigated consumer claims against numerous gambling companies for allegedly profiting from illegal internet casinos—where we've already secured $651 million in cash relief. (Balabanian Decl. ¶ 8.) We're also pioneers in genetic privacy litigation, where we filed some of the first-ever cases and recently certified the first-ever adversarially certified class. *Melvin v. Sequencing, Inc.*, 344 F.R.D. 231, 233 (N.D. Ill. 2023); *see also Cole v. Gene by Gene Ltd.*, No. 14-cv-00004-SLG (D. Alaska). Just considering cases where Edelson PC has served as lead counsel, the firm's verdicts and settlements exceed $5 billion. (Balabanian Decl. ¶ 3.)

The attached declaration sets forth Mr. Balabanian's particular qualifications and those of the Edelson attorneys on this case (which were also detailed in the firm's prior lead motion). (*See* Balabanian Decl. ¶¶ 13–14.) Worth noting are Mr. Balabanian's on-point experience in the most complex privacy actions of the day—Mr. Balabanian was one of the principal attorneys in *Facebook*—and in other headline matters across plaintiffs' work: Mr. Balabanian was one of the attorneys who served the Tort Claimants' Committee in the PG&E bankruptcy, playing a significant role in reaching a record $13.5 billion settlement on behalf of fire victims, and was appointed interim lead counsel in the consolidated litigation seeking to hold technology platforms liable for their hosting of illegal online casinos. (*Id.* ¶ 13.) When it comes to staffing, the firm has intentionally put together a team with diverse types, and years, of experience and

that fill particular needs in this case. The other two partners (including the firm's founder, Jay Edelson), and three associates each have immediately relevant qualifications to their role in this litigation. (*See id.* ¶ 14.) Simply put, our team is able to litigate this case as sole lead.

> **B.    The Class prizes experience in privacy cases and specifically genetic privacy cases, firms with long-term financial viability, and a track record of achieving cash payments in settlements.**

The Class also has clear views about what a firm's characteristics and experience should be to lead this case. The second highest-rated factor on the entire survey was whether a firm had significant experience in privacy class actions. (*See* Data Sheet at 7 (average importance of 6.32 on a 7-point scale).) Close behind was the Class's focus on a firm's experience litigating genetic privacy cases particularly. (*Id.* (importance 6.26).) Interestingly, just as important was a firm's long-term financial viability and resources to litigate this case. (*Id.* (importance 6.29).) The Class also significantly valued the firm's experience generating large cash settlements, and *actually* getting class members paid—i.e., better claims rates—with respective ratings of 6.17 and 6.10. (*Id.*)

When it comes to privacy litigation, the Edelson firm has no comparator. As discussed above, we have a concrete track record of litigating privacy cases rife with issues of first impression to record-setting results. *See In re Facebook*, 522 F. Supp. 3d 617; *Melvin*, 344 F.R.D. at 233; *see also Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12-cv-04069 (N.D. Ill.) (highest TCPA settlement ever, $76 million). The firm was lead counsel in *Spokeo, Inc. v. Robins*, in which the Supreme Court held that "intangible harm" could satisfy Article III standing requirements. *See* 136 S. Ct. 1540 (2016). Litigating *pro bono* on behalf of the American Civil Liberties Union, we obtained a consent decree in 2022 that permanently enjoins Clearview from selling access to its massive database of facial vectors to any private person or company, as well as additional restrictions—a settlement that has been called a "milestone for civil rights." (Balabanian Decl. ¶ 7.) In short, Edelson is the nation's leading class action firm on privacy issues, with the firm's cases "read[ing] like a time capsule of the last decade, charting how computers have been steadfastly logging data about our searches, our friends, our bodies." (*Id.*)

The Class is also particularly concerned about the long-term financial viability of the lead firm, with 52.7% ranking this "very important"—the second-highest weight in this section. (*See* Data Sheet at 19.) While we are not suggesting that firms open their books for forensic review, one indicator is how firms handled the COVID-19 pandemic. While many plaintiffs' firms (either properly or not)[7] competed against their clients to take large Paycheck Protection Program loans, our firm did not—we continued to grow and increased salaries and benefits for our employees. (Balabanian Decl. ¶ 17.) Our finances allow us to compete on price, too: we will cap any fee request at 20% of what is *actually* received by the Class.[8]

When it comes to litigation outcomes, the Class wants a firm that has a record of getting substantial monetary relief and sending that money to the class. (*See* Data Sheet at 7.) Edelson has long been a prominent voice for cash relief (versus credit monitoring or illusory reversionary funds) in settlements, and the numbers speak for themselves: a total of $13.5 billion in PG&E for tort claimants, $650 million in *Facebook*, $651 million and counting in internet-casino litigation, and $76 million in *Birchmeier*. (Balabanian Decl. ¶ 22.) And we have shined a spotlight on an issue that so often gets swept under the rug, which is settlement claims rates. When asked, the Class ranked claims rates *just* behind the monetary relief itself in importance. (*See* Data Sheet at 7.) And that makes sense, because a settlement's claims rate is effectively the chance that any individual class member gets paid—a 20 in 100 chance of

---

[7] A list of PPP loan recipients is publicly available at: *PPP Borrower Search*, PANDEMIC OVERSIGHT, https://www.pandemicoversight.gov/ppp-simple-search-landing (last visited Apr. 17, 2024). Under the PPP program, a firm had to attest that the loan was necessary in light of the firm's finances and access to other capital. Many firms took PPP money while at the same time telling courts that they were financially sound—both can't be true.

A corollary factor relevant to the Class is a firm's ability to attract the best talent. (*See* Data Sheet at 20 (44% of the Class ranking this "very important").) Acknowledging that the concept of the most talented attorneys is somewhat subjective, our firm is able to recruit top students from top law schools the old-fashioned way: by paying associate salaries that out-pace BigLaw. (Balabanian Decl. ¶ 18.) It certainly doesn't hurt that we do interesting work that matters to our attorneys, but that's a subject requiring longer treatment than a footnote.

[8] Unlike other firms, we won't try to monetize injunctive relief or claim indirect benefits to *cy pres* in a fee request. This is not to suggest that incredibly strong injunctive relief is anything but a necessary part of a settlement—it is—and our firm won't present a settlement to the Court that lacks it.

obtaining a monetary recovery is far better than historically-approved 1 in 100 chance.[9] We are the leading edge of what we hope is a broader sea of change: our firm routinely posts claims rates of 20% or more by designing notice and claims processes to get real engagement from the Class. (*See* Balabanian Decl. ¶ 23.) We will commit on this issue too: we will seek the lesser of 20% of the actual benefits to the Class or the *percent* of valid claims.

### C. Edelson's proposed case plan will efficiently move this litigation forward.

Edelson proposes the following case plan:

- *Getting a consolidated complaint on file within 30 days of a leadership decision*. Edelson will work with all counsel to include all relevant claims (including claims stemming from 23andMe's data-mining operation) and classes in a consolidated complaint.

- *Set a timeline for initial disclosures and discovery.* Edelson would seek early initial disclosures and hold a Rule 26(f) conference with 23andMe fourteen days after service of the amended complaint.[10] We will simultaneously present 23andMe with a draft protective order and ESI protocol. On the schedule, we would seek: (1) a six-month, non-bifurcated discovery period, (2) followed by three months of expert discovery, (3) the class certification brief be due one month later, and (4) dispositive motions due 45 days after the ruling.

- *Division of labor*. Edelson does not recommend a complex network of committees or liaison counsel. That said, Edelson will work collaboratively to understand the strengths of each firm and minimize duplication. In any event, all counsel would contemporaneously track time and clearly identify common benefit work.

## IV. CONCLUSION

Plaintiffs respectfully request that the Court appoint Rafey S. Balabanian of Edelson PC as interim lead counsel.

---

[9] Edelson is so concerned with that issue that we made a music video about it. Edelson Creative, *We Don't Talk About Claims Rates*, YOUTUBE (Apr. 7, 2022), https://www.youtube.com/watch?v=L7ULPjEB85.

[10] Edelson has identified the key subjects of discovery required in the litigation with the assistance of its in-house forensic investigations team. (*See, e.g.*, *Melvin*, dkt. 27-1.)

|  |  |
|---|---|
|  | Respectfully Submitted, |
|  | **DAVID MELVIN and J.L.**, individually and on behalf of all others similarly situated, |
| Dated: April 18, 2024 | By: /s/ Rafey S. Balabanian |
|  | *One of Plaintiffs' Attorneys* |

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson (admitted *pro hac vice*)
jedelson@edelson.com
Ari Scharg (admitted *pro hac vice*)
ascharg@edelson.com
J. Eli Wade-Scott (admitted *pro hac vice*)
ewadescott@edelson.com
Michael Ovca (admitted *pro hac vice*)
movca@edelson.com
Emily Penkowski Perez (admitted *pro hac vice*)
epenkowski@edelson.com
Hannah P. Hilligoss (admitted *pro hac vice*)
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the Putative Class*